## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DANIEL FERNANDES
                                    Plaintiff,

        vs.

MICHAEL SENA, Former Correctional Officer
BROCK MORRIS, Former Correctional Officer          Civil Action No.
EDWARD BOULEY, Former Lieutenant
JOHN MURPHY, Former Captain
STEVEN J. SOUZA, Superintendent, Bristol County
Sheriff's Department
THOMAS M. HODGSON, Sheriff, Bristol County
BRISTOL COUNTY SHERIFF'S OFFICE

                                    Defendants.

## **COMPLAINT AND JURY DEMAND**

### **Introduction**

1. This is an action for money damages brought by Plaintiff Daniel Fernandes ("Mr.

Fernandes"), a 29-year-old individual who suffered brutal injury when a correctional officer

maliciously and sadistically beat him while he was awaiting trial at the Ash Street Jail in New

Bedford, Massachusetts. As a result of the beating, Mr. Fernandes suffered near loss of

consciousness, injury to his right temple, a deep gash above his left eye and other facial injuries,

bruised and bleeding wrists, abdominal bruising and pain, scratches to his chest, back bruising

and pain, bruising on his left arm, a large contusion in his groin area, and experienced three

weeks of blood in his urine and pain urinating. Correctional staff thereafter attempted to interfere

with Mr. Fernandes's access to medical care, prompting one of the nurses at the Ash Street Jail

to file a complaint. In addition to his physical injuries, Mr. Fernandes suffered trauma and severe emotional distress as a result of the beating and continues to feel unsafe around correctional staff.

## Jurisdiction and Venue

2. This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Article XXVI of the Declaration of Rights of the Massachusetts Constitution, and Massachusetts common law. This Court has jurisdiction over Mr. Fernandes's federal claims pursuant to 28 U.S.C. § 1331 and § 1343. This Court has supplementary jurisdiction over Mr. Fernandes's state law claims pursuant to 28 U.S.C. § 1367.

3. On information and belief, Defendants are all residents of the Commonwealth of Massachusetts. Venue is thus proper in this Court pursuant to 28 U.S.C. § 1391(a).

## Parties

4. Plaintiff Daniel Fernandes is a 29-year-old individual who was detained at the Ash Street Jail in New Bedford, MA at all relevant times herein.

5. Defendant Michael Sena ("Defendant Sena") was, at all relevant times herein, a correctional officer in Bristol County Sheriff's Office who worked at the Ash Street Jail, including on October 24, 2017. As such, he was responsible for the lawful care and custody of prisoners at the Ash Street Jail. On information and belief, Defendant Sena was fired shortly after Mr. Fernandes's beating. On information and belief, Defendant Sena unexpectedly passed away in Bristol County, Massachusetts on December 7, 2019. Defendant Sena is sued in his individual and official capacities.

6. Defendant Brock Morris ("Defendant Morris") was, at all relevant times herein, a correctional officer in Bristol County Sheriff's Office who worked at the Ash Street Jail, including on October 24, 2017. As such, he was responsible for the lawful care and custody of

prisoners at the Ash Street Jail. On information and belief, Defendant Morris was fired shortly after Mr. Fernandes's beating. On information and belief, Defendant Morris currently resides in Bristol County, Massachusetts. Defendant Morris is sued in his individual and official capacities.

7. Defendant Edward Bouley (Defendant Bouley) was, at all relevant times herein, a Lieutenant in Bristol County Sheriff's Office who worked at the Ash Street Jail, including on October 24, 2017. As such, he was responsible for the lawful care and custody of prisoners at the Ash Street Jail. On information and belief, Defendant Bouley was fired shortly after Mr. Fernandes's beating. On information and belief, Defendant Bouley currently resides in Bristol County, Massachusetts. Defendant Bouley is sued in his individual and official capacities.

8. Defendant John Murphy ("Defendant Murphy") was, at all relevant times herein, a Captain in Bristol County Sheriff's Office who worked at the Ash Street Jail, including on October 24, 2017 when he served as Watch Commander. On information and belief, Defendant Murphy was fired shortly after Mr. Fernandes's beating. On information and belief, Defendant Murphy currently resides in Bristol County, Massachusetts. Defendant Murphy is sued in his individual and official capacities.

9. Defendant Steven J. Souza ("Defendant Souza") was, at all relevant times herein, the Superintendent of Bristol County Sheriff's Office. As Superintendent, Defendant Souza has responsibility over the management and operation of the Ash Street Jail, including training and supervising the personnel and ensuring the lawful care and custody of the individuals detained there. On information and belief, his business address is 400 Faunce Corner Road, North Dartmouth, MA, 02747. Defendant Souza is sued in his individual and official capacities.

10. Defendant Sheriff Thomas M. Hodgson ("Defendant Hodgson") was, at all relevant times herein, the Sheriff of Bristol County. Pursuant to G.L. c. 126, § 16, Defendant Hodgson is

responsible for the custody and control of all prisoners committed to correctional facilities run by Bristol County Sheriff's Office. Defendant Hodgson is responsible for the creation of policies governing the facility and proper training and supervision of his staff and subordinates. His business address is 400 Faunce Corner Road, North Dartmouth, MA, 02747. Defendant Hodgson is sued in his individual and official capacities.

11. Defendant Bristol County Sheriff's Office is the local sheriff's office in Bristol County, Massachusetts, with a business address of 400 Faunce Corner Road, North Dartmouth, MA, 02747. The Bristol County Sheriff's Office oversees and is responsible for the operation and policies of several facilities in Bristol County, including the Ash Street Jail, located at 226 Ash Street, New Bedford, MA 02740. The Bristol County Sheriff's Office is a subdivision of the Commonwealth of Massachusetts, a public employer as defined by M.G.L. c. 258.

12. All defendants were acting within the scope of their employment and under the color of state law at all times relevant to this complaint.

## Statement of Facts

### The October 24, 2017 Beating

13. On October 24, 2017, Mr. Fernandes had just eaten lunch and was taking a nap in his cell located in 7-Alley at the Ash Street Jail facility when he was abruptly awoken by Defendant Bouley and Defendant Morris who appeared in Mr. Fernandes's cell to perform a cell search.

14. This was the third cell search in three days to which Mr. Fernandes was subjected. The officers who performed these "searches" routinely destroyed Mr. Fernandes's personal belongings, including by throwing his family photographs in the toilet.

15. During the October 24, 2017 search, Defendant Bouley and Defendant Morris ordered Mr. Fernandes to submit to a strip search. Mr. Fernandes complied. Defendant Morris then

placed Mr. Fernandes in handcuffs and sat him outside his cell while he and Defendant Bouley searched Mr. Fernandes's room. Mr. Fernandes was cooperative during the search.

16. While Defendant Bouley and Defendant Morris were conducting the search, Defendant Sena, who was assigned to the Block Gate, abandoned his post and proceeded to Mr. Fernandes's cell. The Block Gate is located on the floor below 7-Alley on the opposite side of the building. Neither Defendant Bouley nor Defendant Morris had asked Defendant Sena to join them. Defendant Sena, without authority, instructed another officer to cover his post.

17. During the search, Defendant Bouley found a pair of sneakers in Mr. Fernandes's cell. Defendant Bouley asked Mr. Fernandes if he had a receipt from the commissary for the sneakers. Mr. Fernandes explained that his friend, who was being released, had given Mr. Fernandes the sneakers as a gift. Mr. Fernandes pleaded with Defendant Bouley and Defendant Morris to let him keep his sneakers and explained that none of the officers who conducted his previous cell searches were concerned with him keeping them.

18.  At some point during this discussion, Defendant Sena arrived at Mr. Fernandes's cell. Defendant Sena stood outside the cell with Mr. Fernandes, who was still handcuffed, while Mr. Fernandes continued pleading with Defendant Bouley and Defendant Morris.

19.  Defendant Bouley and Defendant Morris stepped out of Mr. Fernandes's cell and stood outside the door. Defendant Sena pulled Mr. Fernandes to his feet and led him into his cell, depicted below.



20.  Defendant Sena led Mr. Fernandes towards the back of his cell by the toilet. Still handcuffed, Mr. Fernandes turned his body to look back at Defendant Bouley to continue talking to him. Mr. Fernandes admits that he called the correctional officers names because he was upset about them confiscating his sneakers and the harassing searches of his cell.

21.  Defendant Sena punched Mr. Fernandes on the right side of his head multiple times. Mr. Fernandes lost his balance and landed on his knees on top of the bed.

22.  Defendant Sena, grabbing the back right of Mr. Fernandes's head, smashed Mr. Fernandes's face into the cement cell wall several times, causing a deep gash above Mr. Fernandes's left eye in addition to other head injuries.

23.  As Mr. Fernandes began to collapse, Defendant Sena punched him in the left eye.

24. Mr. Fernandes fell onto the bed, partially on his back. Defendant Sena kicked Mr. Fernandes in the groin at least four times while wearing heavy boots.

25. Defendant Sena stepped on Mr. Fernandes's handcuffs to further tighten them such that Mr. Fernandes's wrists began to bleed. Mr. Fernandes's handcuffs had not been safety locked in order to prevent their overtightening.

26. Despite being immediately outside Mr. Fernandes's cell, neither Defendant Morris nor Defendant Bouley did anything in response to Defendant Sena's attack on Mr. Fernandes.

27. After Defendant Sena had been left alone with Mr. Fernandes for approximately nine or ten seconds, Defendant Morris and Defendant Bouley, who had been standing outside, casually entered Mr. Fernandes's cell. Defendant Morris said to Defendant Sena, "Come on, that's enough." Defendant Morris had not previously intervened and had allowed the attack to continue.

28.  Defendant Bouley instructed Defendant Morris and Defendant Sena to bring Mr. Fernandes to the medical unit, which was protocol after any physical altercation. Defendant Morris and Defendant Sena got Mr. Fernandes to his feet and the three officers escorted Mr. Fernandes to medical.

29. On the way to medical, Defendant Sena pushed Mr. Fernandes into the wall several times.

30. Mr. Fernandes was dripping blood down the corridor.

**Interference with Access to Medical Care**

31. When Mr. Fernandes arrived at the medical unit, he was treated by Nurse Teresa Young ("Nurse Young"). Nurse Young immediately placed gauze over the laceration above his left eye and applied pressure to the injury. Nurse Young thereafter cleaned the wound and applied three Steri-Strips across the gash.

32. Nurse Young recommended that Mr. Fernandes be transferred to St. Luke's Hospital in New Bedford, MA, to treat the gash, which was deep and continued to bleed.

33. Mr. Fernandes was in so much pain from his head injuries that he did not notice his other injuries, such as the injuries to his groin, until the next day. Mr. Fernandes downplayed the severity of his pain due to his fear of Defendant Sena.

34. Defendant Sena pressured Nurse Young to simply use Steri-Strips to treat Mr. Fernandes's injury and not to send him to the hospital.

35. Defendant Bouley did not intervene when Defendant Sena pressured Nurse Young to not send Mr. Fernandes to the hospital.

36. Nurse Young felt uncomfortable with Defendant Sena's request and reported Defendant Sena's conduct to her supervisor, Barbara Bell ("Ms. Bell"). Ms. Bell thereafter contacted, Judith Borges, the Director of Medical Services ("Director Borges"). Ms. Bell told Director Borges that Nurse Young said that several Ash Street officers were "giving her a hard time" about sending Mr. Fernandes to the hospital.

37. Director Borges contacted Defendant Murphy, who was the Watch Commander that day, to advise him of the situation. Defendant Murphy had joined the officers in the medical unit after hearing of the assault.

38. Director Borges told Defendant Murphy that Nurse Young was going to reassess Mr. Fernandes's injuries and that he would likely need to be transferred to St. Luke's Hospital for proper treatment. Director Borges asked Defendant Murphy if that was going to be a problem.

39. Defendant Murphy told Director Borges "No, but he really isn't bleeding a lot."

40. Mr. Fernandes told Defendant Murphy, "All this over sneakers."

41.  Defendant Murphy did not interview Mr. Fernandes about his injuries or how he received them.

**Aftermath**

42.  In addition to not interviewing Mr. Fernandes about the incident, Defendant Murphy did not relieve Defendant Sena, Defendant Morris, or Defendant Bouley from duty, despite being told by Mr. Fernandes that he was assaulted. Shockingly, Defendant Murphy instructed Defendant Sena and Defendant Morris to escort Mr. Fernandes from medical to the hole (i.e., solitary confinement) to await his transfer to the hospital.

43.  On the way to the cell, Defendant Sena instructed Mr. Fernandes to "keep his mouth shut" and that if he did, Defendant Sena would "take it easy" on his disciplinary reports.

44.  Mr. Fernandes was intimidated by Defendant Sena and feared retaliation.

45.  Defendant Murphy eventually retrieved Mr. Fernandes to bring him to the hospital. Mr. Fernandes asked Defendant Murphy, "Why did your officers have to do this to me?" Defendant Murphy ignored him and mumbled, "The guys wouldn't do that."

46.  After Mr. Fernandes was evaluated and treated at St. Luke's Hospital, he was transferred directly to a segregation unit in the Bristol County Jail in Dartmouth, MA. Ostensibly, Mr. Fernandes was placed in this unit due to the incident reports Defendant Sena, Defendant Morris, Defendant Bouley and Defendant Murphy submitted after Mr. Fernandes's beating which alleged that he "violently gestured" towards the officers prompting a "take-down."

47.  During his approximately three-week stay in Bristol County Jail, news had spread among the correctional officers of Mr. Fernandes's beating at the Ash Street Jail. Some of the officers at Bristol County Jail taunted Mr. Fernandes and joked that he would not be able to have kids anymore, presumably due to the injury to his groin.

48. Mr. Fernandes was thereafter transferred to another facility in Barnstable County where he spent 6 days in the hole.

**Injuries Suffered**

49. Mr. Fernandes suffered serious physical injuries as a result of Defendant Sena's vicious beating.

50. Due to Defendant Sena's multiple punches to his right temple, Mr. Fernandes suffered injury to the area in addition to acute head pain. Defendant Sena's subsequent smashing of Mr. Fernandes's face into the cement wall caused the deep gash above Mr. Fernandes's left eye and other facial injuries and also contributed to Mr. Fernandes's acute head pain. Mr. Fernandes received four stitches to treat the gash, which is depicted below. Mr. Fernandes's head injuries also resulted in dizziness and near loss of consciousness.



51.  Defendant Sena's punching of Mr. Fernandes in the left eye caused swelling and bruising to the eye area, as shown below. In the days following this photograph, the bruise spread across the entire left side of his face.



52. Mr. Fernandes's wrists were bruised and bleeding from the handcuffs aggressively tightened by Defendant Sena.

53. Mr. Fernandes experienced abdominal bruising and pain, scratches to his chest, back bruising and pain, and bruising on his left arm.

54. Finally, Defendant Sena's multiple kicks with heavy boots to Mr. Fernandes groin area caused a large contusion stretching from his groin down his right leg as seen below.



55. Weeks after the beating, Mr. Fernandes continued to suffer pain from his injuries and three weeks of blood in his urine and pain urinating. As a result of this pain, Mr. Fernandes returned to St. Luke's Hospital several days later for further assessment.

56. In addition to his physical injuries, Mr. Fernandes sustained permanent psychological trauma and extreme emotional distress. During Defendant Sena's relentless assault, Mr. Fernandes feared for his safety and well-being. Mr. Fernandes continues be fearful and distrustful of all correctional officers.

57. Mr. Fernandes fears that he will be retaliated against for filing this lawsuit.

**Exhaustion of Administrative Remedies**

58. Mr. Fernandes exhausted his administrative remedies.

59. Two days after the beating, Mr. Fernandes contacted a case worker at the Bristol County Jail and stated that he wished to file a grievance form to report his assault. The case worker gave Mr. Fernandes a form entitled "Inmate Grievance Form."

60. The 2018 Bristol County Sheriff's Office Inmate Handbook (the "Handbook") states that "Inmate allegations of staff misconduct should be reported in writing to the Superintendent or Correctional Supervisor on a standard Inmate Grievance Form." The Handbook further states,

"Inmates may also contact the Special Investigation Unit … by using the 'investigation hotline' to that office."

61. Mr. Fernandes summarized Defendant Sena's assault on the standard Inmate Grievance Form. As his requested "remedy," Mr. Fernandes stated that he intended to pursue legal action including by contacting the police department to press charges. He wrote this on the back of the grievance form since there was not enough room in the designated section.

62. Three days after filing his grievance form, Mr. Fernandes received news that his grievance had been rejected on two grounds. First, because Mr. Fernandes allegedly failed to list a remedy in the designated section of the form and second, because the action was "non-grievable" since it involved a "disciplinary matter."

63. After receiving the rejection Mr. Fernandes asked several correctional officers and case workers at Bristol County Jail what he should do. They each replied that there was nothing Mr. Fernandes could do and that an appeal would be unavailing since the matter was "non-grievable." Mr. Fernandes requested to use the law library computer, which he was told was broken. Mr. Fernandes was threatened with a disciplinary ticket if he were to file another grievance.

64. On October 26, 2017 Mr. Fernandes also contacted the investigation hotline of the Special Investigation Unit of the Bristol County Sheriff's Department to report the assault. Mr. Fernandes made allegations of the assault to Lieutenant Andrew Alaimo who relayed the information to Sergeant Glenn Taber ("Sergeant Taber"). Sergeant Taber briefly spoke with Mr. Fernandes in person, noting that he had "visible signs of trauma." Sergeant Taber also took pictures of Mr. Fernandes's injuries.

65. Chief Nelson DeGouveia ("Chief DeGouveia") and Captain Robert Perry ("Captain Perry"), officers with the Special Investigations Unit, launched a thorough, multi-day investigation into the assault on Mr. Fernandes. Chief DeGouveia and Captain Perry conducted videotaped interviews of Mr. Fernandes, Defendant Sena, Defendant Morris, Defendant Bouley, Defendant Murphy, and various other witnesses. At the conclusion of the investigation, Chief DeGouveia published a 14-page report documenting his findings of fact and conclusions. That report is attached hereto as Exhibit A.

**The Internal Investigation**

*Mr. Fernandes's Interview*

66. On October 27, 2019, Chief DeGouveia and Captain Perry interviewed Mr. Fernandes about the assault. Mr. Fernandes's account of the assault was consistent with what he wrote on his grievance form. Mr. Fernandes admitted that at one point he twisted his body to look back at Defendant Bouley, with whom he was speaking, but denies making any violent gestures towards Defendant Sena.

67. Mr. Fernandes stated that he has had no problems with the correctional officers at Ash Street Jail since arriving in May 2017. He stated that he did not know why Defendant Sena would assault him.

*Defendant Murphy Interview*

68. On November 2, 2017, Chief DeGouveia interviewed Defendant Murphy. DeGouveia administered a *Garrity* warning, advising that Defendant Murphy could be held liable for statements made during the interview and that he had the right to remain silent on any issues that tended to implicate him in the crime. Defendant Murphy stated that he understood. Defendant Murphy declined to have his union representative present for the interview.

69.  Defendant Murphy stated that he was the Watch Commander on October 24, 2017 when Mr. Fernandes sustained his injuries. Defendant Murphy stated that he did not have much knowledge about the incident because he was in the Watch Commander's office and nobody called him. Defendant Murphy explained that an officer eventually told him that Mr. Fernandes had sustained injuries, but could not remember exactly what that officer told him. Defendant Murphy stated that he went to medical to observe Mr. Fernandes's injuries, but did not interview Mr. Fernandes about them. Defendant Murphy stated that Mr. Fernandes was being cooperative.

70.  Defendant Murphy stated that he did not speak with Defendant Sena regarding what happened.

71.  Defendant Murphy stated that he spoke with Defendant Bouley and Defendant Morris outside of medical. Defendant Bouley told Defendant Murphy that Mr. Fernandes made a violent aggressive move when Defendant Sena was removing his handcuffs and was taken down to the bed, causing the head injuries.

72.  Defendant Murphy stated that he did not inspect the cell after the incident.

73.  When shown photos of Mr. Fernandes's groin injuries, Defendant Murphy stated that he "knows nothing about that." When asked whether anyone had told him that Defendant Sena assaulted Mr. Fernandes, Defendant Murphy stated that he never heard that. Defendant Murphy stated that he did not know why Defendant Sena went up to cell 107.

74.  Defendant Murphy stated that "he only knows what he reads on the officer's reports" and then submits a cover report along with all of the officer's reports.

75. When asked whether Mr. Fernandes said to him "Why would your officers do this to me [?]" when Defendant Murphy was escorting him, Defendant Murphy stated that he could not recall and didn't think he escorted Mr. Fernandes to admissions.

76. When shown a video of him escorting Mr. Fernandes to admissions, Defendant Murphy agreed that "he must have escorted him."

*Defendant Morris Interview*

77. On November 6, 2017, Chief DeGouveia interviewed Defendant Morris. Defendant Morris was joined in the interview by his Union Representative, Antonio Pereira. DeGouveia administered a *Garrity* warning, advising that Defendant Morris could be held liable for statements made during the interview and that he had the right to remain silent on any issues that tended to implicate him in the crime. Defendant Morris stated that he understood.

78. Defendant Morris stated that he and Defendant Bouley conducted a strip search of Mr. Fernandes.

79. Defendant Morris confirmed that he did not observe any visible injuries on Mr. Fernandes during that search. Defendant Morris stated that he placed Mr. Fernandes in handcuffs, which were fastened behind his back, and placed him outside his cell during the search, seated on the floor. Defendant Morris said that Mr. Fernandes was cooperative during the search. Despite Mr. Fernandes's cooperation, Defendant Morris claimed that he thought an extra set of eyes would be good so he allegedly summoned Defendant Sena to come up and assist them.

80. Chief DeGouveia read from Defendant Morris' incident report, which stated that "[Mr.] Fernandes was then placed back inside his cell, and when [Defendant] Sena attempted to take his right hand out of his hand restraints [Mr.] Fernandes made a violent jerking motion towards [Defendant] Sena. This was taken as an act of aggression and [Defendant Morris] and [Defendant] Sena then took inmate [Mr.] Fernandes down on his bunk."

81. Chief DeGouveia explained that if Mr. Fernandes had indeed made this violent move and was taken down by Defendant Sena and Defendant Morris, it would have taken less than a second for these events to transpire. The video, however, showed Defendant Morris and Defendant Bouley casually entering the cell after Defendant Sena was alone with Mr. Fernandes for 9-10 seconds.

82. Chief DeGouveia then asked how Defendant Morris could see if Defendant Sena was actually removing handcuffs off Mr. Fernandes if he was standing outside the cell. Defendant Morris admitted that Defendant Sena's back blocked his view.

83.  Defendant Morris then asked for a moment alone with his Union Representative.

84.  Defendant Morris returned and explained that he went inside the cell and witnessed Mr. Fernandes making a "violent aggressive motion" and assisted Defendant Sena in "regaining control" of him.

85. Chief DeGouveia pointed out that the video showed Defendant Morris remaining outside the cell for 9-10 seconds before casually proceeding into the cell. Defendant Morris stated that as he entered the cell, Mr. Fernandes made the motion and he and Defendant Sena took him down. Defendant Morris stated that Mr. Fernandes did not attempt to strike Defendant Morris or Defendant Sena with his free arm and never fought or otherwise resisted the officers.

86. Chief DeGouveia then showed Defendant Morris photographs of Mr. Fernandes's injuries. Defendant Morris looked at the picture showing Mr. Fernandes's head injury and said that the injury occurred when Mr. Fernandes was taken down. Defendant Morris was then shown a picture of the bruising Mr. Fernandes had on both wrists. Defendant Morris could not explain why Mr. Fernandes would have bruises on both wrists if his right hand was indeed uncuffed.

87. When Chief DeGouveia showed Defendant Morris a photograph of Mr. Fernandes's groin injuries, Defendant Morris immediately denied doing that. When Chief DeGouveia asked how Mr. Fernandes could have sustained extensive injuries like that, Defendant Morris stated that the only thing he could think of is that Mr. Fernandes banged his groin on the post of the bed.

88. Chief DeGouveia told Defendant Morris about Mr. Fernandes's version of events, including that Defendant Sena punched him, forcefully pushed his head against the cell, and kicked him in the groin. Defendant Morris denied observing Defendant Sena assault Mr. Fernandes.

*Defendant Sena Interview*

89. On November 6, 2017, Chief DeGouveia interviewed Defendant Sena. Defendant Sena was joined in the interview by his Union Representative, Antonio Pereira. DeGouveia administered a *Garrity* warning, advising that Defendant Sena could be held liable for statements made during the interview and that he had the right to remain silent on any issues that tended to implicate him in the crime. DeGouveia provided Defendant Sena with a form containing the *Garrity* warnings, which Defendant Sena signed to acknowledge he understood it.

90. Chief DeGouveia explained that he was investigating the incident involving Mr. Fernandes and asked Defendant Sena how he became involved. Defendant Sena stated that he looked up on 7-Alley and saw Mr. Fernandes sitting on the tier. He stated he "took it upon himself" to see what was going on.

91. Chief DeGouveia showed Defendant Sena the beginning of the video showing Defendant Sena picking up Mr. Fernandes from the ground and escorting him into his cell. Chief DeGouveia counted ten seconds and paused the video tape. Chief DeGouveia asked Defendant

Sena what happened in those ten seconds. Defendant Sena could not provide Chief DeGouveia with answers and stated that he couldn't remember exactly how he took Mr. Fernandes down.

92. When pressed for more details, Defendant Sena offered that he entered the cell with Mr. Fernandes and proceeded to remove his handcuffs when Mr. Fernandes "violently spun" as if he was going to assault him. Defendant Sena stated that he took this as an act of aggression and took him down to his bed.

93. Chief DeGouveia challenged Defendant Sena's story in light of the evidence. Chief DeGouveia showed Defendant Sena the picture of the blood on the wall and asked, "Why was there more than one blood splatter on the wall." Defendant Sena stated that the only thing he can remember was that Mr. Fernandes hit his head against the wall when he was taking him down and it looked like Mr. Fernandes was turning his head back towards Defendant Sena, so Defendant Sena put his head up against the wall a second time to get control of him.

94.  Defendant Sena was then shown pictures of Mr. Fernandes's groin injuries. Defendant Sena stated, "That wasn't me." Defendant Sena agreed that he would have seen these injuries during the strip search of Mr. Fernandes that occurred after Mr. Fernandes received medical treatment and was being placed into the hole. Defendant Sena later offered the explanation that Mr. Fernandes may have struck the bed post when he and Defendant Morris were getting him back up.

95.  Defendant Sena admitted that he told Nurse Young to use Steri Strips and not to send Mr. Fernandes to the hospital. Defendant Sena stated that he recommended it so that there would be no medical run, since it was late in the day and he didn't want to go on a medical run or have anyone else go. Defendant Sena stated that he believed Defendant Bouley was present when he

was instructing the nurse to apply Steri Strips and not send Mr. Fernandes to the hospital. Defendant Sena admitted that he was "stupid" to instruct Nurse Young in this way.

96. Chief DeGouveia asked Defendant Sena to explain the bruising on both of Mr. Fernandes's wrists if Mr. Fernandes only had on one cuff. Defendant Sena had no explanation.

*Defendant Bouley Interview*

97. On November 7, 2017, Chief DeGouveia interviewed Defendant Bouley. Defendant Bouley was joined in the interview by his Union Representative, Antonio Pereira. Chief DeGouveia administered a *Garrity* warning, advising that Defendant Bouley could be held liable for statements made during the interview and that he had the right to remain silent on any issues that tended to implicate him in the crime. Chief DeGouveia provided Defendant Bouley with a form containing the *Garrity* warnings, which Defendant Bouley signed to acknowledge he understood it.

98. Chief DeGouveia explained that he was investigating the incident involving Mr. Fernandes and asked Defendant Bouley to explain his involvement and actions with respect to the incident.

99. Defendant Bouley stated that he was instructed by Major Joseph Oliver to search Mr. Fernandes's cell along with Defendant Morris to look for sneakers. Defendant Bouley stated that Mr. Fernandes complied with his orders and was cooperative during the search. Defendant Bouley stated that if Mr. Fernandes hadn't been cooperative, he would have been placed in another cell.

100. Defendant Bouley confirmed that Mr. Fernandes had no visible injuries on his body when he conducted the strip search.

101. Defendant Bouley stated that he recovered the sneakers and questioned Mr. Fernandes as to whether he had a receipt to show proof that he purchased them from the canteen. Defendant Bouley stated that Mr. Fernandes did not have such a receipt and became upset that his sneakers were being confiscated. At that point, Defendant Bouley stated that he and Defendant Morris exited the cell.

102. Defendant Bouley continued, stating that Defendant Sena, who was standing outside, escorted Mr. Fernandes into the cell to remove his handcuffs. Chief DeGouveia pointed out that Defendant Bouley and Defendant Morris were standing outside of Mr. Fernandes's cell, while Defendant Sena was alone with Mr. Fernandes for 10 seconds. Chief DeGouveia asked Defendant Bouley what he observed.

103.  Defendant Bouley agreed that he was standing outside the cell with Defendant Morris. Defendant Bouley admitted that he could not say whether Mr. Fernandes had one cuff removed because everything happened so quickly and Defendant Sena was able to take him down. Defendant Bouley stated that the reason he and Defendant Morris did not enter the cell was because Defendant Sena already had control of Mr. Fernandes and that the SIU would be asking why three guys needed to go into the cell, given Mr. Fernandes's small stature.

104.  Defendant Bouley stated that Defendant Morris and Defendant Sena were assisting Mr. Fernandes to his feet as he entered the cell. Defendant Bouley stated that he observed a cut above Mr. Fernandes's eye and instructed both to bring Mr. Fernandes to medical.

105. Chief DeGouveia asked Defendant Bouley whether he was present when Defendant Sena told Nurse Young to put Steri Strips over Mr. Fernandes's cut. Defendant Bouley downplayed the incident, stating, "That's a comment you make, security can't tell her what to

do." When Chief DeGouveia informed Defendant Bouley that Nurse Young was uncomfortable with Defendant Sena's request, Defendant Bouley responded with "That's what they do."

106. Chief DeGouveia showed Defendant Bouley pictures of Mr. Fernandes's injuries and the blood on the wall in the cell. Defendant Bouley stated that he had taken pictures of Mr. Fernandes's injuries while he was in the medical unit in addition to the pictures of his cell.

107. Chief DeGouveia showed Defendant Bouley pictures of Mr. Fernandes's groin injuries, which were taken by Sergeant Tabor a few days after the assault. Defendant Bouley stated, "That didn't happen with us." He stated that Mr. Fernandes never complained to Nurse Young about these injuries.

108. Chief DeGouveia told Defendant Bouley that his testimony did not match up with the evidence. Chief DeGouveia pointed out that Mr. Fernandes had redness on the right side of his face.

109. To further explain Mr. Fernandes's injuries, Defendant Bouley stated, "[Mr.] Fernandes had recreation [] that morning; he could have sustained the injuries in the shower in the Dayroom. He always wanted to be a Gangbanger; part of their initiation is to take a beating."

110. Chief DeGouveia asked Defendant Bouley about the bruising to Mr. Fernandes's wrists from the handcuffs. Defendant Bouley stated, "It's gonna happen." Chief DeGouveia told Defendant Bouley that if Mr. Fernandes only had one cuff on, he wouldn't have bruising on both wrists. In response, Defendant Bouley stated that when you put the handcuffs back on "[y]ou're not going to put them on like you are going to a dance. They were on firm."

**The Investigative Report**

111. On November 7, 2017, Chief DeGouveia submitted a fourteen-page investigatory report containing the conclusions resulting from the investigation. That report is attached hereto as Exhibit A.

112. Chief DeGouveia concluded that the evidence corroborated Mr. Fernandes's version of events, including that:

- Mr. Fernandes's groin injuries occurred in the cell with Defendant Sena;

- Explanations by Defendant Sena and Defendant Morris that Mr. Fernandes's groin injuries occurred inadvertently were not credible;

-  Defendant Sena's account that Mr. Fernandes injured his head when Defendant Sena "took [] Mr. Fernandes down to the bed" was not credible in light of how high the blood splatter was on the wall and the amount of blood; and

- Mr. Fernandes's account, that Defendant Sena punched him on his right side of his head then forcefully pushed him towards the bed and struck his head against the wall several times was more consistent with the evidence.

113. Chief DeGouveia wrote, "It is clear that [Defendant] Sena's actions show that he had motives to go to cell 107."

114. As to Defendant Sena's individual conduct, Chief DeGouveia concluded the following:

- "[Defendant] Sena failed to meet the high level of professionalism, accountability and integrity established by the sheriff's office."

- "[Defendant] Sena was not truthful in his initial report. [Defendant] Sena wrote, '*This officer and [Defendant] Morris then took [Mr.] Fernandes down on his bunk.*' The video and [Defendant] Bouley's initial report, along with statements made by [Defendant] Bouley during questioning by Captain [] Perry and myself reveal that [Defendant] Morris was standing outside the cell with [Defendant] Bouley."

- "[Defendant] Sena was not truthful when questioned by investigators and gave different accounts of what happened during the 9 seconds in question."

- "[Defendant] Sena abandoned his post [Block Gate] and as he stated in the interview 'He took it upon himself [] to go to cell 107.'"

- "[Defendant] Sena, [Defendant] Morris and [Defendant] Bouley have different accounts of what happened in cell #107."

- "[Defendant] Sena without authorization instructed Officer Joseph Teixeira to go cover his assignment **BLOCK GATE** and handed him [Officer Teixeira] the keys."

- "[Defendant] Sena attempted to persuade [Nurse] Young to put Steri Strips on [Mr.] Fernandes and stop him from going to St. Luke's Hospital to receive proper medical treatment."

115. As to Defendant Morris's individual conduct, Chief DeGouveia concluded the following:

- "[Defendant] Morris failed to meet the high level of professionalism, accountability and integrity established by the sheriff's office."

- "[Defendant] Morris was not truthful with his account of events. [Defendant] Morris stated that he assisted [Defendant] Sena['s] takedown [of] [Mr.] Fernandes to the bed. The video and statements from [Defendant] Bouley along with [Defendant] Sena's statement contradict [Defendant] Morris' accounts. I find that [Defendant] Morris falsified his report."

- "[Defendant] Morris neglected to activate a Code Red if he did in fact witness [Mr.] Fernandes make a violent, aggressive movement towards [Defendant] Sena."

116. As to Defendant Bouley's individual conduct, Chief DeGouveia concluded the following:

- "[Defendant] Bouley failed to meet the high level of professionalism, accountability and integrity established by the sheriff's office."

- "[Defendant] Bouley was not truthful with all the accounts of events. During interviews [Defendant] Bouley made sarcastic statements regarding [Mr.] Fernandes wanting to be a gang member and maybe he got beat up in the shower, to the point he was Insubordinate."

- "[Defendant] Bouley neglected to act as a supervisor. [Defendant] Sena took it upon himself to respon[d] to cell 107 and get involved in a situation that he should have not been involved in."

- "[Defendant] Bouley failed to take proper action after the incident. [Defendant] Sena and Defendant Morris should have been removed from the situation and not allowed to stay."

117. As to Defendant Murphy's individual conduct, Chief DeGouveia concluded the following:

- "[Defendant] Murphy neglected his duties as a Watch Commander."

- "[Defendant] Sena, [Defendant] Morris and [Defendant] Bouley caused a serious situation at the Ash St. jail. [Defendant] Murphy did not have control of the incident involving [Mr.] Fernandes."

- "When being questioned by Captain []Perry and me, [Defendant] Murphy stated that he couldn't recall most of the critical questions. The most important question he was ask[ed], 'Did [Mr.] Fernandes tell you, why would your officers do this to me [?]' And [Defendant] Murphy could not recall."

- "[Defendant] Murphy was contacted by [Director] Borges inquiring why [Mr.] Fernandes was being denied medical treatment. [Defendant] Murphy had been in Medical to assess the situation [and] he should have immediately relieved [] [Defendant] Sena [and] [Defendant] Morris in Medical and taken over the incident. [Defendant] Murphy took no action until he was contacted by [Director] Borges."

118. On information and belief, Defendant Sena, Defendant Morris, Defendant Bouley, and Defendant Murphy were let go following the assault of Mr. Fernandes.

**Bristol County Sheriff's Office's History of Prisoner Mistreatment**

119. Bristol County Sheriff's Office has a sordid history of prisoner mistreatment in its jails. This mistreatment includes not only instances where excessive force was unlawfully used by correctional staff and permitted to occur in Bristol County jails, but also includes denials of medical care, overcrowding, poor nutritional services, inadequate mental health screening and treatment, and a lack of adequate programming.

120. In fact, on June 14, 2018, Attorney General Maura Healey wrote to Secretary Daniel Bennett of the Executive Office of Public Safety and Security to express her concerns about the

"risks to the health and safety of inmates housed by the Bristol County Sheriffs Office," and

asked that Secretary Bennett investigate and "if necessary, take action to establish and enforce

minimum standards for the care and custody of all persons committed to county correctional

facilities."[1] Prompted by repeated lawsuits and reports to the Civil Rights Division of the Office

of the Attorney General, the Attorney General pointed to the high rate of suicide among inmates

and the routine and long-term segregation of inmates with mental health illnesses. The letter also

noted more general issues with the conditions of confinement in Bristol, including "inadequate

mental health screening and treatment, denials of medical care, overcrowding, unsanitary

conditions, poor nutritional services, and a lack of adequate programming at BCSO facilities."

121. Inadequate conditions of confinement are not a new problem in Bristol County, or at the

Ash Street Jail. Indeed, in 1998, inmates at the Ash Street Jail obtained an injunction requiring

that Defendant Hodgson and other defendants house only one inmate per cell given extreme

overcrowding at the jail. Further, Defendant Hodgson was required to use all available cells to

house inmates—and not, as he had been, reserving 30 cells for local arrests. *See Kelley, et al. v*

*Hodgson, et al.*, C.A. No. 983083C (Sup. Ct. Oct. 2, 1998).

122. More recently, inmates successfully sued guards and officers in Bristol County, their

supervisors (including Defendant Hodgson), and the Sheriff's Office for abuse while in custody.

In *Martinez v. Hodgson, et al.*, plaintiffs were arrested by New Bedford police and transferred to

the Ash Street Jail where they alleged, in relevant part, that the police "conspired with and

instructed correction officers at the jail to use excessive force against them." 265 F. Supp. 2d

135, 139 (D. Mass. 2003). After a trial, the jury returned a verdict against one of the police and

---

[1] Letter from Attorney General Maura Healey to Secretary Daniel Bennett of the Executive Office of Public Safety and Security (June 14, 2018), *available at* https://bccjustice.files.wordpress.com/2018/10/healey.pdf (last accessed July 23, 2020).

the unknown corrections officers at the Ash Street Jail, and awarded plaintiffs compensatory damages, punitive damages, and fees and costs. *Id.* at 139-40. In a subsequent trial, the Bristol County Sheriff's Department settled after the case went to the jury but before the jury returned its verdict. *Id.* at 140.

123. Just recently, Defendant Hodgson was personally involved in an incident that resulted in three (3) ICE detainees being sent to the hospital for injuries sustained during an altercation—involving tear gas, pepper spray, and a K9 unit—with Defendant Hodgson and others at the Bristol County House of Corrections. *See* S. Dooling, "ICE Detainees Allege Assault, Isolation Used As Retaliation At Bristol County; Sheriff Denies Claims," WBUR (May 6, 2020), *available at* https://www.wbur.org/news/2020/05/06/bristol-sheriff-hodgson-altercation-recording.

124. In particular, Defendant Sena had a history of abusive conduct towards prisoners. Mr. Fernandes himself witnessed Defendant Sena pepper spray a prisoner who was already detained in handcuffs and complying with orders. In addition, Defendant Sena had a reputation for hurting prisoners when putting on their handcuffs.

125. On information and belief, Defendant Hodgson and Defendant Souza had prior notice of the propensity of Bristol County Sheriff's Office employees to violate the constitutional rights of its prisoners, but took inadequate steps to train and supervise Bristol County Sheriff's Office employees, correct their abuse of authority, or implement meaningful procedures to discourage their unlawful practices.

126. On information and belief, Defendant Hodgson and Defendant Souza never instructed their employees how to stop a colleague's assault on an inmate, in part because of their general disregard for the welfare of inmates in their custody. These attacks by guards against inmates

have occurred before, and, on information and belief, Defendant Hodgson and Defendant Souza have not instituted the training or provided instruction necessary to avoid them going forward.

127. On information and belief, Defendant Hodgson and Defendant Souza tolerated, as institutional policy, practice or custom, violations of the constitutional rights of its prisoners by Bristol County Sheriff's Office employees. Indeed, as further evidence of this policy, when news quickly spread of Mr. Fernandes assault among the correction officers, the reaction to his brutal beating was to laugh at him and make jokes about his ability to have children.

128. Defendant Hodgson was personally involved in an incident that sent three detainees to the hospital.

129. The effect of this policy was to encourage Bristol County Sheriff's Office employees, including Defendant Sena, to use excessive force against prisoners.

130. This policy contributed to the physical assault on Mr. Fernandes and his resulting injuries.

131. Defendant Hodgson and Defendant Souza were deliberately indifferent to the grave risk of harm posed by their ill-trained employees.

### COUNT I
### Violation under 42 U.S.C. § 1983 - Excessive Force
(Against Defendant Sena and Defendant Bouley)

132. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

133. As detailed above, Defendant Sena used excessive force against Mr. Fernandes on October 24, 2017, without provocation and without legitimate penal justification. Defendant Sena's use of force was malicious and sadistic for the purpose of causing Mr. Fernandes harm.

134. The actions of Defendant Sena were performed under color of state law and violated Mr. Fernandes's rights under the Fourteenth Amendment to the United States Constitution as set out by the United States Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).

135. The excessive force used by Defendant Sena against Mr. Fernandes was the direct and proximate cause of serious physical and psychological injuries to Mr. Fernandes.

136. The conduct of Defendant Sena was willful and exhibited a flagrant disregard for Mr. Fernandes's constitutional rights.

137. Defendant Bouley is vicariously liable for Defendant Sena's use of excessive force. Defendant Sena's wrongful conduct resulted in a constitutional violation. Defendant Bouley encouraged and/or condoned Defendant Sena's unconstitutional conduct by observing the assault and failing to take appropriate steps to protect Mr. Fernandes from harm under the circumstances.

## COUNT II
### Violation under 42 U.S.C. § 1983 - Failure to Intervene
(Against Defendant Bouley and Defendant Morris)

138. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

139. Defendant Morris and Defendant Bouley were both present when Defendant Sena used excessive force against Mr. Fernandes.

140. On information and belief, Defendant Morris and Defendant Bouley observed Defendant Sena's use of excessive force against Mr. Fernandes.

141. Due to the fact that the assault lasted 9 or 10 seconds and both Defendant Morris and Defendant Bouley were mere steps away, both Defendant Morris and Defendant Bouley were in a position to realistically prevent the use of excessive force and had sufficient time to do so.

142. As a result of Defendant Morris and Defendant Bouley's failure to intervene, Mr. Fernandes's injuries were exacerbated, including but not limited to the severe injury to Mr. Fernandes's groin.

143. The actions of Defendant Morris and Defendant Bouley were performed under color of state law and violated Mr. Fernandes's rights under the Fourteenth Amendment to the United States Constitution.

## <u>COUNT III</u>
### Violation under 42 U.S.C. § 1983 - Interference with Access to Medical Care
(Against Defendant Sena, Defendant Murphy and Defendant Bouley)

144. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

145. Mr. Fernandes's medical needs were serious. Nurse Young had determined that his injuries warranted additional care at St. Luke's Hospital.

146. Defendant Sena intentionally interfered with Mr. Fernandes's prescribed treatment and access to necessary medical care by pressuring Nurse Young to apply Steri Strips and to not send Mr. Fernandes to the hospital for further treatment.

147. Defendant Murphy intentionally interfered with Mr. Fernandes's prescribed treatment and access to necessary medical care by telling Director Borges that Mr. Fernandes was only bleeding a little, implying that Mr. Fernandes did not need to go to the hospital.

148. Defendant Bouley intentionally interfered with Mr. Fernandes's prescribed treatment and access to necessary medical care by refusing to intervene when he witnessed Defendant Sena

pressuring Nurse Young to apply Steri Strips and to not send Mr. Fernandes to the hospital for further treatment.

149. The actions of Defendant Sena, Defendant Murphy and Defendant Bouley were performed under color of state law and violated Mr. Fernandes's rights under the Fourteenth Amendment to the United States Constitution.

150. The actions of Defendant Sena, Defendant Murphy and Defendant Bouley demonstrated a deliberate indifference to Mr. Fernandes's serious medical needs.

## COUNT IV
### Violation under 42 U.S.C. § 1983 - Failure to Train and/or Supervise
(Against Defendant Hodgson, Defendant Souza and Defendant Bristol County Sheriff's Office)

151. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

152. On information and belief Defendant Hodgson, Defendant Souza and the Bristol County Sheriff's Office failed to properly train and/or supervise correctional staff in matters of excessive force, including Defendant Sena, Defendant Morris, Defendant Bouley, and Defendant Murphy, violating Mr. Fernandes's rights under the Fourteenth Amendment and 42 U.S.C. § 1983.

153. On information and belief, Defendant Hodgson, Defendant Souza and Bristol County Sheriff's Office had prior notice of the propensity of Bristol County Sheriff's Office employees to violate the constitutional rights of its prisoners, but took inadequate steps to train and supervise Bristol County Sheriff's Office employees, correct their abuse of authority, or implement meaningful procedures to discourage their unlawful practices.

154. On information and belief, Defendant Hodgson, Defendant Souza, and Bristol County Sheriff's Office tolerated, as institutional policy, practice or custom, violations of the constitutional rights of its prisoners by Bristol County Sheriff's Office employees.

155. The effect of this policy was to encourage Bristol County Sheriff's Office employees, including Defendant Sena, to use excessive force against prisoners and for others, such as Defendant Morris, Defendant Bouley and Defendant Murphy, to neglect their duty to intervene when confronted by their colleague's use of excessive force and/or properly mitigate or investigate the circumstances of the assault.

156. At all times relevant to this Complaint, Defendant Hodgson, Defendant Souza and the Bristol County Sheriff's Office were deliberately indifferent to the grave risk of harm posed by their ill-trained employees.

157. This policy contributed to the physical assault on Mr. Fernandes and his resulting injuries.

## COUNT V
### Violations under Article I of the Declaration of Rights of the Massachusetts Constitution- Due Process
(Against All Defendants)

158. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

159. As detailed above, Defendant Sena used excessive force against Mr. Fernandes on October 24, 2017, without provocation and without legitimate penal justification. Defendant Sena's use of force was malicious and sadistic for the purpose of causing Mr. Fernandes harm and was objectively unreasonable. Defendant Sena's actions caused serious injury to Mr. Fernandes.

160. Defendant Morris and Defendant Bouley failed to stop the unprovoked attack on Mr. Fernandes during the approximately nine or ten seconds in which it occurred, despite being present when the assault occurred. Defendant Morris and Defendant Bouley were in a position to realistically prevent the use of excessive force and had sufficient time to do so.

161. Defendant Sena and Defendant Murphy thereafter intentionally interfered with Mr. Fernandes's prescribed treatment and access to necessary medical care in further violation of Mr. Fernandes's rights under Article I of the Declaration of Rights of the Massachusetts Constitution.

162. The actions of Defendant Sena, Defendant Morris, Defendant Murphy and Defendant Bouley were performed under color of state law, and violated Mr. Fernandes's rights under Article I of the Declaration of Rights of the Massachusetts Constitution.

163. The conduct of Defendant Sena, Defendant Morris, Defendant Murphy and Defendant Bouley was willful and exhibited a flagrant disregard for Mr. Fernandes's rights under the Massachusetts Constitution.

164. On information and belief, Defendant Hodgson, Defendant Souza and Bristol County Sheriff's Office failed to properly train, supervise, or discipline correctional staff in matters of excessive force, including Defendant Sena, Defendant Morris, Defendant Bouley, and Defendant Murphy, violating Mr. Fernandes's rights under Article I of the Declaration of Rights of the Massachusetts Constitution.

## COUNT VI
### Assault and Battery
(Against Defendant Sena and Defendant Bristol County Sheriff's Office)

165. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

166.  Defendant Sena committed an assault and battery on Mr. Fernandes by using excessive force against him, including by punching him in the head, smashing his head against a cement wall, and kicking him in the groin while wearing heavy boots.

167. As a direct and proximate result of Defendant Sena's wrongful actions, Mr. Fernandes was severely injured.

168. As Defendant Sena's employer, Defendant Bristol County Sheriff's Office is vicariously liable for Defendant Sena's assault and battery on Mr. Fernandes. Bristol County Sheriff's Office was Defendant Sena's employer at all times relevant to the Complaint and Defendant Sena's tortious acts were committed within the scope of his employment.

## COUNT VII
### Intentional Infliction of Emotional Distress
(Against Defendants Sena, Morris, Bouley and Murphy)

169. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

170. All individual Defendants knew or should have known that their actions would cause emotional distress to Mr. Fernandes. Defendants' actions were extreme and outrageous and beyond the bounds of civilized decency.

171. Defendants' actions proximately caused Mr. Fernandes to suffer severe emotional distress.

## COUNT VIII
### Failure to Intervene
(Against Defendant Morris and Defendant Bouley)

172. Mr. Fernandes repeats and realleges each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

173. Defendant Morris and Defendant Bouley were both present when Defendant Sena used excessive force against Mr. Fernandes.

174. On information and belief, Defendant Morris and Defendant Bouley observed Defendant Sena's use of excessive force against Mr. Fernandes.

175. Defendant Morris and Defendant Bouley were in a position to realistically prevent the use of excessive force and had sufficient time to do so. Defendant Sena's assault lasted for 9 or 10 seconds and both Defendant Morris and Defendant Bouley were mere steps away.

176. As a result of Defendant Morris and Defendant Bouley's failure to intervene, Mr. Fernandes's injuries were exacerbated, including but not limited to the severe injury to Mr. Fernandes's groin.

**WHEREFORE,** Mr. Fernandes requests the following relief against all Defendants:

a) Compensatory damages;

b) Punitive damages;

c) Special damages;

d) Reasonable attorneys' fees and costs;

e) Prejudgment interest;

f) Such other relief as this Court may deem just and proper.

Respectfully submitted,

Plaintiff Daniel Fernandes,
By his attorneys,

 /s/ Caroline S. Donovan
Michael B. Keating, BBO #263360
Caroline S. Donovan, BBO #683274
Joanna L. McDonough, BBO #699056
Christian Garcia, BBO #703433
Ethan Severance, BBO #703052
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1000
Fax: 617-832-7000
MKeating@foleyhoag.com
CDonovan@foleyhoag.com
JMcDonough@foleyhoag.com
CGarcia@foleyhoag.com
Dated:  August 28, 2020                ESeverance@foleyhoag.com