UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-11612-GAO

DANIEL FERNANDES,
Plaintiff,

v.

MICHAEL SENA, Former Correctional Officer, BROCK MORRIS, Former Correctional
Officer, EDWARD BOULEY, Former Lieutenant, JOHN MURPHY, Former Captain, STEVEN
J. SOUZA, Superintendent, Bristol County Sheriff's Department, THOMAS M. HODGSON,
Sheriff, Bristol County, and BRISTOL COUNTY SHERIFF'S OFFICE,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
September 29, 2021

O'TOOLE, S.D.J.

The magistrate judge to whom this matter was referred has filed a Report and
Recommendation ("R&R") recommending that the defendants' Motion to Dismiss be ALLOWED
as to the assault and battery claim against Bristol County Sherriff's Office ("BCSO") (Count VI);
ALLOWED as to the state constitutional claim as to BCSO, Thomas M. Hodgson, and Steven J.
Souza (Count V); ALLOWED as to the § 1983 claim against BCSO and against Hodgson and
Souza in their official capacities (Count IV); but DENIED as to the § 1983 claim against Hodgson
and Souza in their individual capacities (Count IV). No objections to the R & R have been filed.

After review of the relevant pleadings and submissions, I concur with the magistrate
judge's analysis and proposed ruling, and therefore ADOPT the R&R (dkt. no. 25) in its entirety.

The defendants' Motion to Dismiss (dkt. no. 8) is GRANTED in part and DENIED in part, consistent with the magistrate judge's recommendations.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
Senior United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL FERNANDES,
        Plaintiff,


        v.                                          CIVIL ACTION NO. 20-11612-GAO[1]


EDWARD BOULEY, Former Lieutenant
BRISTOL COUNTY SHERIFF'S OFFICE
JOHN MURPHY, Former Captain
MICHAEL SENA, Former Correctional Officer
THOMAS M. HODGSON, Sheriff, Bristol County
BROCK MORRIS, Former Correctional Officer
STEVEN J. SOUZA, Superintendent, Bristol County Sheriff's Department,
        Defendants.


REPORT AND RECOMMENDATION ON
DEFENDANTS, BRISTOL COUNTY SHERIFF'S OFFICE, THOMAS M. HODGSON, AND
STEVEN J. SOUZA'S, MOTION TO DISMISS (#8).

I. Introduction.

        Daniel Fernandes brought suit against seven defendants in connection with an incident in

which he was beaten by Correctional Officer Michael Sena on October 24, 2017, when Fernandes

was in custody awaiting trial at the Ash Street Jail in New Bedford. (#1.) Three of the defendants,

the Bristol County Sheriff's Office (BCSO), the Sheriff of Bristol County, Thomas M. Hodgson,

and the Superintendent of the Bristol County Sheriff's Office, Steven J. Souza, have moved to

---

[1] On January 20, 2021, this case was referred to the undersigned for rulings on non-dispositive
motions and reports and recommendations on dispositive motions, including defendants' motion
to dismiss. (#18.)

dismiss all claims against them (Counts IV-VI) under Fed. R. Civ. P. 12(b)(6). (##8, 9.)[2] Fernandes opposes the motion. (#11.) The court heard oral argument on June 28, 2021. (##20, 22, 23.)

Count IV of the complaint alleges a violation of 42 U.S.C. § 1983 for failure to train or supervise against BCSO and against Hodgson and Souza in their individual and official capacities. (#1 ¶¶9-10, 151-157.) Count V alleges a violation of Article I of the Massachusetts Declaration of Rights against all defendants, including against BCSO and against Hodgson and Souza in their individual and official capacities. (#1 ¶¶9-10, 158-164.) Count VI alleges assault and battery against Sena and BCSO. (#1 ¶¶165-168.)

For the reasons that follow, the court recommends that the motion to dismiss Count IV, the § 1983 claim against BCSO and against Hodgson and Souza in their official capacities, be ALLOWED, but recommends that the motion to dismiss the § 1983 claim against Hodgson and Souza in their individual capacities be DENIED. The court recommends that the motion to dismiss Count V, the state constitutional claim, against BCSO, Hodgson, and Souza be ALLOWED. Finally, Fernandes concedes that Count VI should be dismissed against BCSO (#11 at 20) and the court recommends that the motion to dismiss Count VI, the assault and battery claim against BCSO, be ALLOWED.

---

[2] Sena died before the complaint was filed. (#1 ¶5.) The remaining defendants filed answers to the complaint. (##14 (Brock Morris); 16 (Edward Bouley); 17 (John Murphy).) This Report and Recommendation does not concern any claims against Sena, Morris, Bouley, or Murphy.

II. <u>Standard of Review</u>.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges a complaint for failing to state a claim on which relief can be granted. In determining whether a complaint adequately states a claim, the court

> isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements, then take[s] the complaint's well-plead (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor….

*Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021) (citation and punctuation omitted). *See Parker v. Landry*, 935 F.3d 9, 13-14 (1st Cir. 2019). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007)).[3] The determination is fact-specific and requires the court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

A complaint need not contain detailed factual allegations, *Haley*, 657 F.3d at 46 (*quoting Twombly*, 550 U.S. at 555), *Iqbal*, 556 U.S. at 678, but it must set out sufficient factual allegations to state a claim that is "plausible" on its face. *Id*. (*quoting Iqbal*, 556 U.S. at 678)). *See Twombly*, 550 U.S. at 556, 570. The plausibility requirement is not a "probability" requirement; it only demands "more than a sheer possibility" that a party is liable for the misconduct alleged. *Justiniano*, 986 F.3d at 19 (punctuation omitted) (*quoting Iqbal*, 556 U.S. at 678). *See Twombly*, 550 U.S. at 556. If the court cannot discern more than a sheer possibility from the factual allegations, then the complaint has not shown "that the pleader is entitled to relief." *Id*.

---

[3] Under Rule 12(b)(6), the court may augment the well-pled facts and reasonable inferences "with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

(punctuation omitted) (*quoting Iqbal*, 556 U.S. at 679) (*quoting* Fed. R. Civ. P. 8(a)(2)). *See Twombly*, 550 U.S. at 556.

III. The Complaint.

On October 24, 2017, Sena and Morris were correctional officers at the Ash Street Jail; Bouley was a lieutenant; and Murphy was a captain and was acting as "Watch Commander." (#1 ¶¶1, 5-8.) Fernandes alleges that on that day, Sena beat him while Morris and Bouley were present, and then Sena, while Bouley was present, and Murphy interfered with his access to medical care. *Id*. ¶¶13-41, 132-150.

BCSO "oversees and is responsible for the operation and policies of several facilities in Bristol County, including the Ash Street Jail." It "is a subdivision of the Commonwealth of Massachusetts," and a "public employer" as defined in Mass. Gen. Laws ch. 258. *Id*. ¶11.

At all times relevant to the complaint, Hodgson was the Sheriff of Bristol County. Under Mass. Gen. Laws ch. 126, § 16, Hodgson is responsible for "the custody and control of all prisoners committed to correctional facilities run by" BCSO and for "the creation of policies governing the facility and proper training and supervision of his staff and subordinates." Hodgson is sued in his individual and official capacities. *Id*. ¶10.

Souza was the Superintendent of BCSO and "has responsibility over the management and operation of the Ash Street Jail, including training and supervising the personnel and ensuring the lawful care and custody of the individuals detained there." Souza is also sued in his individual and official capacities. *Id*. ¶9.

On October 24, 2017, Fernandes was taking a nap in a cell when Morris and Bouley woke him up. They were there to conduct the third search of Fernandes' cell in as many days. *Id*. ¶¶13-14. They ordered Fernandes to submit to a strip search; he complied. Morris then placed Fernandes

in handcuffs and sat him outside the cell while Morris and Bouley searched it. Fernandes was cooperative during the cell search. *Id*. ¶15. While Bouley and Morris were searching, Sena abandoned his post at "the Block Gate," which was on a different floor and on the opposite side of the building from the area where Fernandes' cell was located, and went to Fernandes' cell. *Id*. ¶16. Neither Morris nor Bouley had asked Sena to join them. Sena, without authority, had instructed another officer to cover his post. *Id*.

Morris and Bouley found a pair of sneakers in Fernandes' cell. Bouley asked Fernandes if he had a receipt from the commissary for them. Fernandes explained that a friend who was being released gave the sneakers to him as a gift. He pleaded with Morris and Bouley to let him keep them. *Id*. ¶17. Sena arrived and stood outside the cell with Fernandes, who was still handcuffed. *Id*. ¶18. Morris and Bouley stepped out of the cell and stood outside the door. *Id*. ¶19. Sena pulled Fernandes to his feet and led him into the cell. *Id*. Fernandes, still handcuffed, turned to look back at Bouley as he talked to him. Upset about the cell searches and sneakers, Fernandes called the officers names. *Id*. ¶20.

Sena punched Fernandes on the right side of his head multiple times. Fernandes lost his balance and landed on his knees on the bed. Sena grabbed the back of Fernandes' head and smashed his face into the cement wall several times, causing a deep gash above his left eye. He then punched Fernandes in his left eye. Fernandes fell onto the bed, partially on his back. Sena, wearing heavy boots, then kicked Fernandes in the groin at least four times. Sena also stepped on Fernandes' handcuffs to tighten them, causing his wrists to bleed. *Id*. ¶¶21-25.

Although they were standing right outside the cell, Morris and Bouley did not do anything in response to Sena's attack on Fernandes. After Sena had been left alone with Fernandes, beating

him, for 9 to 10 seconds, Morris and Bouley casually entered the cell. Morris said to Sena: "Come on, that's enough." *Id*. ¶¶26-27.

Bouley instructed Morris and Sena to bring Fernandes to the medical unit, as protocol required after any physical altercation. Morris and Sena got Fernandes to his feet and the three officers escorted him there. While in route, Sena pushed Fernandes several times. Fernandes was dripping blood down the corridor. *Id*. ¶¶28-30.

At the medical unit, Fernandes was treated by nurse Teresa Young, who recommended that Fernandes be transferred to St. Luke's Hospital for treatment of the gash above his left eye, which was deep and continued to bleed. Sena pressured Young to just use Steri-Strips and not to send Fernandes to the hospital. Bouley, who was present, did not intervene. *Id*. ¶¶34-35.

Sena's request made Young uncomfortable. She reported it to her supervisor, Barbara Bell, who contacted the Director of Medical Services, Judith Borges. Bell told Borges that Young said that several Ash Street officers were "giving her a hard time" about sending Fernandes to the hospital. Borges contacted Murphy to advise him of the situation. Murphy had joined the officers in the medical unit after hearing about the assault. *Id*. ¶¶36-37.

Borges told Murphy that Young was going to reassess Fernandes' injuries and that he would likely need to be transferred to the hospital for treatment. Borges asked Murphy if that was going to be a problem. Murphy told Borges: "No, but he really isn't bleeding a lot." Fernandes told Murphy: "All this over sneakers." *Id*. ¶¶38-40.

Murphy did not interview Fernandes about his injuries. *Id*. ¶41. Nor did Murphy relieve Sena, Morris or Bouley of duty, although Fernandes told Murphy that he had been assaulted. *Id*. ¶42. Instead of relieving them of duty, Murphy instructed Sena and Morris to escort Fernandes from the medical unit to solitary confinement to await transfer to the hospital. *Id*. On the way, Sena

told Fernandes to "keep his mouth shut" and that if he did, Sena would "take it easy" on his disciplinary reports. Fernandes was intimidated by Sena and feared retaliation. *Id.* ¶¶43-44. Murphy eventually retrieved Fernandes from solitary confinement for transfer to the hospital. Fernandes asked Murphy: "Why did your officers have to do this to me?" Murphy mumbled: "The guys wouldn't do that." *Id.* ¶45.

After he was treated at St. Luke's Hospital,[4] Fernandes was sent to the Bristol County Jail in Dartmouth. He was placed in the segregation unit because Sena, Morris, Bouley, and Murphy had filed incident reports alleging that Fernandes had "violently gestured" towards them, prompting a "take-down." *Id.* ¶46. At the Bristol County Jail, news spread of the assault. Some of the officers at the Bristol County Jail taunted Fernandes and joked that, due to his groin injury, he would not be able to have children. *Id.* ¶47.

On October 26, 2017, Fernandes filed a grievance form at the Bristol County Jail about the assault. Since there was not enough room in the designated section on the form, he listed the remedy on the back of the form. *Id.* ¶¶59, 61. Three days later, Fernandes learned that his grievance had been rejected because he did not list the remedy in the designated section. In addition, the action was deemed "non-grievable" because it concerned a "disciplinary matter." *Id.* ¶62. Fernandes asked several officers and case workers at the Bristol County Jail what he should do. He was told that there was nothing he could do and that an appeal would be pointless because the

---

[4] Fernandes alleges that he suffered permanent psychological trauma and extreme emotional distress. (#1 ¶56.) He also suffered serious physical injuries including head pain; facial injuries, like a gash above his left eye requiring four stitches and swelling and bruising in the area of his left eye that spread to the side of his face; dizziness; near loss of consciousness; wrist bleeding and bruising; abdominal pain and bruising; scratches to his chest; back pain and bruising; left arm bruising; a large contusion stretching from his groin down his right leg; and, for three weeks after the incident, blood in his urine and pain while urinating, which caused him to return to St. Luke's Hospital for further evaluation. *Id.* ¶¶49-55. There are pictures of his physical injuries in the complaint. *Id.* at 10-12.

action was deemed "non-grievable." He asked to use the law library computer but was told that it was broken. He was threatened with a "disciplinary ticket" if he filed another grievance form. *Id*. ¶63.

On October 26, 2017, Fernandes also contacted BCSO's Special Investigation Unit (SIU). *Id*. ¶64. SIU Sergeant Glenn Taber briefly spoke to Fernandes in person, noting "visible signs of trauma," and took photographs of his injuries. *Id*. SIU Chief Nelson DeGouveia and Captain Robert Perry investigated the assault. They conducted videotaped interviews, including of Fernandes, *id*. ¶¶66-67; Murphy, *id*. ¶¶68-76; Morris, *id*. ¶¶77-88; Sena, *id*. ¶¶89-96; and Bouley, *id*. ¶¶97-110. Chief DeGouveia eventually submitted a 14-page report concerning the assault.[5]

Chief DeGouveia found that "[t]he evidence [did] not match the officers' testimony and accounts." (#4 at 12.) He concluded that Sena lied in his report, as Sena wrote that he and Morris "'…*then took inmate Fernandes down on his bunk*'" but security video and Bouley's report and Bouley's statements revealed that Morris was standing outside the cell with Bouley. *Id*. at 13. He attempted to persuade Young to put Steri-Strips on Fernandes and tried to stop Young from sending Fernandes to the hospital to receive proper medical treatment. *Id*. Sena also lied when questioned by investigators. *Id*.

Chief DeGouveia concluded that Morris lied when he stated that he assisted Sena in taking Fernandes down on his bunk. Morris "falsified his report." *Id*. at 14.

Chief DeGouveia also found that Bouley lied. He also made sarcastic comments about Fernandes wanting to be a gang member and getting beat up in the shower "to the point he was

---

[5] The report is identified as Exhibit A in the complaint and the court considers it to be incorporated by reference. (#1 ¶¶65, 111; *see* #4 (report)). Defendants have not challenged the authenticity of the report and do not argue that the court may not consider it. *See Haley*, 657 F.3d at 46.

[i]nsubordinate." *Id*. Bouley neglected his duties as a supervisor where Sena "took it upon himself" to get involved in a situation in which he should not have been involved. Bouley also failed to take proper action after the incident, as Sena and Morris should have been removed from duty. *Id*.

Chief DeGouveia found that Captain Murphy neglected his duties as Watch Commander. *Id*. Sena, Morris, and Bouley created a "serious situation" over which Murphy did not have control. *Id*. He should have relieved Sena and Morris of duty but took no action until he was contacted by Borges. *Id*. at 15. When interviewed, he stated that he could not recall in response to most of the critical questions. *Id*. at 14.

The complaint alleges that BCSO has a "sordid history of prisoner mistreatment in its jails," including instances of excessive force and denials of medical care, overcrowding, poor nutritional services, inadequate mental health screening and treatment, and a lack of adequate programming. (#1 ¶119.) Specifically, the complaint describes a 1998 case in which inmates at the Ash Street Jail obtained an injunction requiring that Hodgson and other prison officials take certain measures in light of overcrowding. *Id*. ¶121 (citing *Kelley, et al. v. Hodgson, et al.*, C.A. No. 983083C (Sup. Ct. Oct. 2, 1998.)[6]

The complaint describes another case in which plaintiffs were arrested by New Bedford police officers and transferred to the Ash Street Jail, where police officers allegedly conspired with and instructed correctional officers to use excessive force against them. After a trial, the jury returned a verdict against one police officer and unknown correctional officers. At a second trial,

---

[6] This unreported state superior court order is available at 1998 WL 1181663.

BCSO settled with plaintiffs before the jury returned a verdict. *Id*. ¶122 (citing *Martinez v. Hodgson*, 265 F. Supp. 2d 135 (D. Mass. 2003).)[7]

The complaint describes a 2018 letter from Attorney General Maura Healey to Executive Office of Public Safety and Security Secretary Daniel Bennett. According to the complaint, in the 2018 letter, the Attorney General "express[ed] her concerns about the 'risks to the health and safety of inmates housed by" BCSO and asked the Secretary to "investigate and 'if necessary, take action to establish and enforce minimum standards for the care and custody of all persons committed to county correctional facilities.'" *Id*. ¶120. The 2018 letter was prompted by repeated lawsuits and reports to the Civil Rights Division. It emphasized the high suicide rate, long-term segregation of inmates with mental health issues, and more general issues with conditions of confinement in Bristol County, "including 'inadequate mental health screening and treatment, denials of medical care, overcrowding, unsanitary conditions, poor nutritional services, and a lack of adequate programming at BCSO facilities.'" *Id*.[8]

Finally, the complaint describes a 2020 incident which allegedly resulted in three Immigration and Customs Enforcement detainees being sent to the hospital for injuries sustained

---

[7] The complaint cites, and thus incorporates by reference, the 2003 order in the *Martinez* case, No. 01-CV-10261-WGY. According to the 2003 order, the incident occurred on November 25, 1999. *Martinez*, 265 F. Supp. 2d at 138.

[8] The complaint cites "Letter from Attorney General Maura Healey to Secretary Daniel Bennett of the Executive Office of Public Safety and Security (June 14, 2018), *available at* https://bccjustice.files.wordpress.com/2018/10/healey.pdf…" (#1 ¶120, n. 1.) In the memorandum in support of the motion to dismiss and at oral argument, defense counsel made statements about the response to the 2018 letter that are not derived from the complaint or the letter, which is incorporated by reference into the complaint. *E.g*., #9 at 4 n. 6. The court agrees with Fernandes that factual representations that are not based on the complaint or incorporated documents, matters of public record, or facts susceptible to judicial notice must be disregarded. *See Haley*, 657 F.3d at 46.

during an altercation with Hodgson and other prison officials at the Bristol House of Corrections. The incident involved the use of tear gas, pepper spray, and a K9 unit. *Id*. ¶¶123, 128.[9]

The complaint further alleges that Sena had a history of "abusive" conduct toward inmates. *Id*. ¶124. Fernandes "witnessed [Sena] pepper spray a prisoner who was already detained in handcuffs and complying with orders." *Id*. The complaint also alleges that Sena "had a reputation for hurting prisoners when putting on their handcuffs." *Id*.

The complaint alleges, on information and belief, that BCSO, Hodgson, and Souza had notice of the propensity of BCSO employees to violate constitutional rights of inmates but took inadequate steps to train and supervise them, correct abuses of authority, or implement meaningful procedures to discourage their unlawful practices. *Id*. ¶¶125, 153. Hodgson and Souza never instructed BCSO employees how to stop a colleague's assault on an inmate, in part because of their general disregard for the welfare of inmates. *Id*. ¶126. Assaults on inmates have occurred in the past and Hodgson and Souza have not instituted training or provided instruction necessary to avoid them. *Id*. Hodgson and Souza were deliberately indifferent to the grave risk of harm posed by ill-trained employees. *Id*. ¶¶131, 156.

The complaint also alleges that BCSO, Hodgson, and Souza tolerated, as an institutional policy, practice or custom, violations of the constitutional rights of inmates by BCSO employees. *Id*. ¶¶127, 154. The effect of this policy was to encourage BCSO employees, including Sena, to

---

[9] The complaint cites "S. Dooling, 'ICE Detainees Allege Assault, Isolation Used as Retaliation at Bristol County; Sheriff Denies Claims,' WBUR (May 6, 2020), *available at* https://www.wbur.org/news/2020/05/06/bristol-sheriff-hodgson-altercation-recording" (#1 ¶123.) This news report relates that one detainee claimed that Hodgson assaulted him: "The sheriff approached me and attacked me…." The article also reports that attorneys for detainees and their families complained that Hodgson used "isolation and retaliatory behavior" against inmates who asserted their rights. Again, in the memorandum and at oral argument, defense counsel made factual representations about the 2020 incident that the court cannot properly consider. *E.g.*, #9 at 4, 5-6.

use excessive force and to encourage BCSO employees, including Morris, Bouley and Murphy, to neglect their duty to intervene when confronted with their colleagues' use of excessive force or to mitigate or investigate. *Id*. ¶¶129, 155. The policy contributed to the assault on Fernandes. *Id*. ¶¶130, 157.

IV. Discussion.[10]

A. Count IV should be dismissed against BCSO and against Hodgson and Souza in their official capacities, but not against Hodgson and Souza in their individual capacities.

42 U.S.C. § 1983 permits civil action against

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws….

42 U.S.C. § 1983.

It is settled that Congress did not intend to waive states' Eleventh Amendment sovereign immunity protection from suit in federal court by enacting § 1983, and that the Commonwealth of Massachusetts has not consented to suit under § 1983. *See Will v. Michigan Dept of State Police*, 491 U.S. 58, 66 (1989). *See also Woodbridge v. Worcester State Hosp*., 384 Mass. 38, 44-45 (1981). On the related, but separate, issue of statutory interpretation, it is also settled that states, state agencies, and state employees in their official capacities are not "persons" within the meaning

---

[10] The court rejects Fernandes' argument, *see* #11 at 7-8, that defendants' motion to dismiss should be summarily denied under L.R. 7.1(b)(1), which requires that a party include in a memorandum "citation of supporting authorities [and] why the motion should be granted." Defendants' memorandum includes appropriate legal citations. *E.g.*, #9 at 6-8. Fernandes does not assert prejudice from a lack of citations to the record, which is not complex or voluminous. *Cf. 4 MVR, LLC v. Warren W. Hill Construction Co., Inc*., No. 12-CV-10674-DJC, 2016 WL 4775451, at *8 (D. Mass. Sept. 20, 2016) (declining to strike affidavit filed late and separately from defendant's motion in violation of L.R. 7.1(b)(1) where plaintiff did not allege prejudice).

of § 1983. *Will*, 491 U.S. at 66-67, 70-71.[11] Count IV, alleging a violation of § 1983 against BCSO and against Hodgson and Souza in their official capacities, should be dismissed. *See* #1 ¶¶9-10, 151-157.[12]

That leaves Count IV against Hodgson and Souza in their individual capacities, which essentially alleges that Hodgson and Souza failed to train or supervise members of the correctional staff, including Sena, on matters of excessive force. *See id*.

1. Relevant law.

a. Excessive force.

The Due Process Clause of the Fourteenth Amendment[13] prohibits a correctional officer from purposefully or knowingly using objectively unreasonable force against a pretrial detainee. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-397 (2015). *See Lombardo v. City of St. Louis, Missouri*, --- U.S. ---, 141 S.Ct. 2239, 2241 & n. 2 (2021) (per curiam). Whether force was

---

[11] There is no dispute that BCSO is a state agency and that Hodgson and Souza are state employees. *Doan v. Bergeron*, No. 15-CV-11725-IT, 2016 WL 5346935, at *5 (D. Mass. Sept. 23, 2016).

[12] Judges in this district routinely dismiss § 1983 claims against the Commonwealth of Massachusetts, its agencies, and its employees in their official capacities on the constitutional ground, the statutory ground, or both. *E.g.*, *Fraser v. Massachusetts Bay Trans. Auth.*, No. 20-CV-11654-FDS, 2021 WL 2458203, at *12 (D. Mass. June 16, 2021); *Dubose v. Massachusetts*, No. 20-CV-11084-ADB, 2021 WL 1238421, at *3 (D. Mass. April 2, 2021); *Collymore v. Suffolk County Sheriff Dept.*, No. 18-CV-11217-NMG, 2018 WL 3720057, at *1-2 (D. Mass. Aug. 3, 2018); *Boulais v. Commonwealth*, No. 00-CV-12086-GAO, 2002 WL 225936, at *1 & n. 1 (D. Mass. Jan. 30, 2002). The court is not persuaded by Fernandes' argument, *see* #23 at 4, that defendants waived sovereign immunity simply by failing to raise the issue in their motion to dismiss pleadings. *See New Hampshire v. Ramsey*, 366 F.3d 1, 17 (1st Cir. 2004).

[13] Pretrial detainees are protected under the Fourteenth Amendment, rather than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). *See Kingsley*, 576 U.S. at 400 ("pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'") (citations omitted).

13

objectively unreasonable depends on the facts and circumstances of each case. *Id*. at 397 (*citing Graham v. Conner*, 490 U.S. 386, 396 (1989)). *See Lombardo*, 141 S.Ct. at 2241.

b. <u>Supervisory liability</u>.[14]

The criteria for establishing supervisory liability are "exceptionally stringent." *Justiniano*, 986 F.3d at 20 (citation omitted). Liability must be based on the supervisor's own acts or omissions, not a respondeat superior theory. *Id*. (*quoting Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016)). Negligence is insufficient. *Id*. (*quoting Guadalupe-Báez*, 819 F.3d at 515). *See Penate v. Hanchett*, 944 F.3d 358, 367 (1st Cir. 2019); *Parker*, 935 F.3d at 15.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plausibly allege both "that one of the supervisor's subordinates abridged the plaintiff's constitutional rights <u>and</u> that the supervisor's (in)action was affirmatively linked to that behavior in the sense that it could be characterized as gross negligence amounting to deliberate indifference." *Justiniano*, 986 F.3d at 20 (emphasis in original) (punctuation omitted) (*quoting Guadalupe-Báez*, 819 F.3d at 514-515) (further citation omitted). "Deliberate indifference" generally requires a grave risk of harm, plus the supervisor's actual or constructive knowledge of that risk and failure to take easily available measures to address it. *Id*. (citation omitted). *See Penate*, 944 F.3d at 367; *Parker*, 935 F.3d at 14; *Guadalupe-Báez*, 819 F.3d at 515. Notice is a salient issue. *Penate*, 944 F.3d at 367 (citation omitted). *See Parker*, 935 F.3d at 15; *Guadalupe-Báez*, 819 F.3d at 515. A supervisor may be liable for the "foreseeable consequences" of a subordinate's behavior if he would have known about the behavior but for his deliberate indifference. *Penate*, 944 F.3d at 367 (citation omitted).

---

[14] In the § 1983 context, supervisory liability claims typically arise in one of two ways: either a supervisor is alleged to have been a direct participant in the constitutional violation or he is alleged to have trained or supervised a subordinate with deliberate indifference. *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009). Only the latter theory is relevant here.

Though intertwined with deliberate indifference, causation is a separate, essential element for supervisory liability. *Justiniano*, 986 F.3d at 20-21 (citation omitted). There must be a "solid" connection between the supervisor's own acts or omissions and the subordinate's violation of plaintiff's constitutional rights. *Id.* (*quoting Guadalupe-Báez*, 819 F.3d at 514-515). As relevant here, a complaint must plausibly allege that the lack of training or supervision caused the subordinate to take actions that were objectively unreasonable and constituted excessive force. *Id.* at 20 (citation omitted).

To plead or prove deliberate indifference or causation, plaintiff may rely on "a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Guadalupe-Báez*, 819 F.3d at 515 (citation omitted). *See Parker*, 935 F.3d at 15, 17 (discussing "rare" *Guadalupe-Báez* "exception" as it relates to deliberate indifference and causation). *See also Penate*, 944 F.3d at 368 (deliberate indifference). "Isolated" violations are insufficient. *Parker*, 945 F.3d at 15, 16; *Penate*, 944 F.3d at 368.[15]

c. Qualified immunity.

Qualified immunity is a judicial doctrine designed to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Haley*, 657 F.3d at 47 (citation and punctuation omitted). A court's determination of whether defendants are entitled to qualified immunity has two steps. It first asks whether plaintiff has plausibly alleged a violation

---

[15] The complaint alleges that BCSO, Hodgson, and Souza tolerated, as an institutional policy, custom, or practice, violations of the constitutional rights of prisoners by BCSO employees. (#1 ¶¶127, 154.) No institutional policy, custom, or practice other than the failure to train or supervise is identified. *See id*. ¶¶125-131, 151-157. Under this rubric, a complaint must plausibly allege deliberate indifference and causation. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). *See Rodriquez v. Furtado*, 950 F.2d 805, 813 (1991). Generally, a "pattern of similar constitutional violations" is necessary. *Id*. at 62. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985).

of his constitutional right. If so, it then asks whether plaintiff's constitutional right was "clearly established" at the time of the violation. *Penate*, 944 F.3d at 366 (citation omitted). *See Maldonado v. Fontanes*, 568 F.3d 263, 268-269 (2009). The second step has two aspects. One focuses on the clarity of the law at the time of the constitutional violation. *Id.* (citation omitted). *See Maldonado*, 568 F.3d at 269. The other focuses on the facts of the case and whether a reasonable defendant would have understood that his conduct violated plaintiff's constitutional right. *Id*. (citation omitted). *See Maldonado*, 568 F.3d at 269. The inquiry is not undertaken "as a broad general proposition." *Maldonado*, 568 F.3d at 269 (citation omitted). The salient issue is whether the law at the time of the constitutional violation gave defendant "fair warning" that his particular conduct was unconstitutional. *Id*. (citation omitted).

In supervisory liability cases, the second step is bifurcated and satisfied only when the subordinate's conduct violated a clearly established constitutional right and it was clearly established that a supervisor would be liable for the constitutional violation of a subordinate in that context. *Penate*, 944 F.3d at 366 (citation omitted). If the constitutional right and availability of supervisory liability in that context are both clearly established, then the qualified immunity inquiry reduces to a test of objective reasonableness. *Id*. (citation omitted). The analysis is merits-like, but analytically distinct. The court asks whether, in the circumstances, the supervisor should reasonably have understood that his conduct jeopardized plaintiff's constitutional right. *Id*. (citation omitted).

2. <u>Application</u>.

a. <u>Supervisory liability</u>.

As an initial matter, the court rejects defendants' argument that, because BCSO investigated and then disciplined the four correctional officers directly involved in the incident,

Hodgson and Souza cannot be liable for the violation of Fernandes' constitutional rights. *E.g.*, #9 at 6; 23 at 11, 17.[16] The record is undeveloped as to SIU's role and what involvement it has in investigations of wrongdoing by BCSO's employees. Hodgson and Souza could well have acted with deliberate indifference in training and supervising correctional officers and caused the constitutional violation alleged here, *see Justiniano*, 986 F. 3d at 20-21, notwithstanding the fact that a unit in the Sheriff's Department conducted a post hoc investigation into the use of excessive force against Fernandes.

Further, the facts alleged in the complaint raise serious questions about the institutional response to Fernandes' beating. At oral argument, defense counsel stated that BCSO "took immediate action" after the incident. (#23 at 17). Accepting the well-pled factual allegations in the complaint as true, however, the incident was only investigated after Fernandes reported it to multiple sources, including Watch Commander Murphy and caseworkers, to no avail, before he finally reached the SIU and spoke to someone who did something. As set forth in the complaint, numerous people, including supervisors, caseworkers, and presumably the many correctional officers who taunted Fernandes about having been kicked in the groin, knew that Sena had beat him, or at least that Fernandes was accusing him of it, and did nothing. In fact, when Fernandes attempted to report the incident on a written form, he was thwarted and threatened with further punishment if he kept trying.

---

[16] According to the complaint, Sena, Morris, Bouley, and Murphy were all fired shortly after the incident. (#1 ¶5-8, 118.) At oral argument, defense counsel said that two individuals were fired after the incident and two retired, and that the two individuals who were fired were then re-hired. (#23 at 11.)

Drawing all reasonable inferences in plaintiff's favor, the court finds that the following non-speculative, non-conclusory factual allegations in the complaint push Count IV across the line from "sheer possibility" to "plausibility."

First, the complaint alleges that Sena left his post against regulations and went to Fernandes' cell for no apparent reason. (#1 ¶16.) Presumably, Bouley, who was a lieutenant, ought to have asked Sena what he was doing there. That he did not suggests that Sena's disregard for regulations and his unnecessarily inserting himself into the search of Fernandes' cell was accepted, if not encouraged, by other correctional officers, including a supervisor.

Next, Morris and Bouley stood outside the cell and permitted Sena, who had no business being there, to lead Fernandes into the cell, where he then began beating him. *Id*. ¶¶19, 20, 26. A picture of the cell in the complaint shows that the cell was extremely small, *id*. at 6; if Morris and Bouley were standing outside the cell, they must have seen the beating.

After 9 to 10 seconds of watching Sena punching Fernandes, smashing his face several times into a cement wall, stepping on his handcuffs to tighten them until his wrists bled, and kicking him several times in the groin while wearing heavy boots, Morris and Bouley causally entered the cell and Morris said to Sena: "Come on, that's enough." *Id*. ¶¶21-27. It is reasonable to infer from Morris and Bouley's conduct that Sena's behavior was not shocking to Morris and Bouley, nor did it warrant any prompt response. After the beating, rather than relieving Sena of duty, Bouley instead had Sena assist him and Morris in taking Fernandes to the medical unit, thereby enabling Sena to continue assaulting Fernandes by pushing him several times on the way. *Id*. ¶¶28-29.

Once in the medical unit, Sena, with Bouley looking on, pressured Young not to send Fernandes to the hospital. *Id*. ¶¶34-35. Young felt uncomfortable enough that she called her

supervisor to report that several correctional officers were "giving her a hard time" about providing Fernandes with adequate medical care.  *Id*. ¶36.  It is reasonable to infer that the officers did so in order to cover up the assault. Further, the fact that the very officer who had beaten Fernandes was free to stand in the nurse's office, in the presence of a supervisor who knew what he had done, and try to dictate what medical treatment Fernandes should receive, permits an inference that the officers were not in fear of being disciplined for beating an inmate or standing by while the beating occurred, or for trying to interfere with his receiving adequate medical care.

Young's report eventually resulted in the director of medical services asking Murphy if it was going to pose problems if Fernandes was sent to the hospital, *id*. ¶38, suggesting that this was not an isolated incident, and medical personnel had to confer with the Watch Commander to ensure that they could exercise their judgment regarding the care to be provided to an injured inmate. Murphy answered by disagreeing that Fernandes' injuries warranted his being sent to the hospital. *Id*. ¶39. The officers' attempts to prevent Fernandes from receiving medical care point to a joint effort by the officers to cover up what Sena had done, and to their lack of concern for Fernandes' welfare.[17]

Murphy, the Watch Commander, did nothing in response to the incident, even though he saw Fernandes in the medical unit and Fernandes told him that he had been assaulted. He did not interview Fernandes about the incident. He did not relieve Sena, Morris, or Bouley from duty, but

---

[17] The complaint implicates two categories of putative constitutional violations: excessive force and interference with access to medical care. Count IV, § 1983 claim against BCSO, Hodgson, and Souza, alleges the failure to train or supervise on matters of excessive force, not a failure to train or supervise on matters of access to medical care. *See* #1 ¶¶151-157. Nevertheless, the court considers the complaint as a whole and views the facts regarding interference with access to medical care as relevant to the officers' efforts to cover up what had happened.

instead had Sena and Morris escort Fernandes to solitary confinement, thus giving Sena the opportunity to threaten and intimidate Fernandes. *Id*. ¶¶41-44.

Fernandes was then punished for the incident because the officers lied in their reports about it, indicating that Fernandes made a violent gesture, prompting Sena and Morris to take him down to the bed when, in reality, Fernandes turned around and called the officers names, prompting Sena to beat him while Morris and Bouley stood outside the cell, doing nothing. *Id*. ¶¶20, 46. When Fernandes attempted to file a grievance about the incident, he was prevented from doing so for a nonsensical reason pertaining to his filling out the form incorrectly. *Id*. ¶61-62. He was told by caseworkers and correctional officers that there was nothing he could do and was threatened with more punishment if he filed another grievance. *Id.* ¶63. These institutional obstacles to Fernandes' attempts to report the incident, including his being threatened with punishment if he kept trying to report it, further illustrate an institution-wide acceptance of the use of excessive force against detainees, an institutional failure to investigate such incidents, and a wide-spread effort to cover up wrongdoing on the part of the officers.

Sena, Morris and Bouley lied in their reports and statements. Bouley was insubordinate during his interview with SIU officials. In his, Murphy claimed a lack of memory. (#4 at 12-15.) These actions show, first, that the officers did not take the investigation seriously and, second, that they attempted to further cover up the assault.

Finally, when Fernandes was in another institution, being punished in solitary confinement, he was the butt of jokes from other officers who heard that he had been attacked by being kicked in the groin. (#1 ¶47.) The obvious inference is that those officers, too, found the report of the use of excessive force to be normal, not worthy of acting on, and even humorous.

20

In sum, the facts set out in the complaint establish that Sena was not acting as a rogue employee, or that this was a solitary incident. Caseworkers and correctional officers, including supervisors, knew Sena had beaten Fernandes, or at least that Fernandes was complaining that he had. These employees not only did nothing to investigate or otherwise respond to the incident in an appropriate way, but the four officers directly involved attempted to cover up Sena's actions after the fact. Based on the allegations in the complaint, one may infer that the use of excessive force against detainees was commonplace and tolerated by a wide swath of employees.

The court also gives weight to allegations in the complaint that Sena used pepper spray on a compliant, handcuffed inmate and that he had a reputation for hurting inmates when putting handcuffs on them. *See* #1 ¶124. While the complaint generally alleges that Hodgson and Souza had notice of BCSO employees' propensity to violate prisoners' constitutional rights, it does not specifically allege that Hodgson and Souza had notice of Sena's. *See* #1 ¶¶125, 153. Nevertheless, it is reasonable to infer that Sena's use of pepper spray on any inmate, not to mention a compliant, handcuffed inmate, would have to be reported, documented, and reviewed up the chain of command.

The court gives some weight to the *Martinez* case, involving the use of excessive force, although the fact that the incident in question there happened 20 years ago diminishes its value. *See* #1 ¶122. Lastly, it gives some weight to the 2020 incident, in which Hodgson himself allegedly assaulted an inmate, and which involved the use of tear gas, pepper spray, and a K9 unit, and resulted in injuries to immigration detainees. *See* #1 ¶123.

Overall, the court finds that the complaint sets out factual allegations that sufficiently allege "a known history of widespread abuse sufficient to alert [Hodgson and Souza] to ongoing violations." *Guadalupe-Báez*, 819 F.3d at 515 (citation and punctuation omitted). The concerted

efforts of four officers, including a lieutenant and the Watch Commander on the day in question, to perpetrate the abuse of Fernandes, to allow Sena to continue to have abusive contact with Fernandes after the incident, to attempt to interfere with Fernandes' medical care, to not investigate the beating, and to lie about it after the fact, plausibly support the allegation that there was an accepted custom of using excessive force on detainees and of failing to intervene when a detainee was beaten. The further difficulties Fernandes had in reporting the beating and the fact that he was the butt of jokes among officers at another institution, facts which are separate from the beating itself, serve to reinforce the plausible inference that there was universal disregard for constitutional violations and a culture of failing to report them. The allegation that Sena pepper-sprayed a compliant, handcuffed inmate, his reputation for violence, the *Martinez* case, and the 2020 incident, in which Hodgson himself is alleged to have participated, together support a plausible inference that Hodgson and Souza were on notice of ongoing violations, and that their failure to train and supervise constituted direct (in the case of the incident in which Hodgson himself participated) and "indirect conduct that amounts to condonation or tacit authorization." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012) (citation omitted).

The court's findings are in sync with other cases in which § 1983 claims based on the failure to train or supervise on matters of excessive force have been held to survive Rule 12(b)(6) motions. *See*, *e.g.*, *Humphrey v. Comoletti*, No. 15-CV-14170-ADB, 2017 WL 1224539, at *2, 9-10 & n. 7 (D. Mass. Mar. 31, 2017) (denying motion to dismiss § 1983 claim under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978), based on Fall River's failure to train or supervise police; facts "very thinly but plausibly" alleged deliberate indifference and causation where plaintiffs described underlying excessive force incident and one other recent excessive force incident which resulted in death and involved same officer; court took judicial notice of existence

of newspaper article suggesting more excessive force incidents). *See also*, *e.g.*, *Bochart v. City of Lowell*, 989 F. Supp. 2d 151, 155-156 (D. Mass. 2013) (same, as to § 1983 claim under *Monell* based on Lowell's failure to train or supervise police; complaint identified multiple reports of alleged excessive force, misuse of pepper spray, and denial of medical treatment in fifteen-year period, including two incidents in which officers allegedly used excessive force and pepper spray and denied medical treatment within two months of underlying incident; complaint further alleged that city did not discipline any officers in seven years despite forty-plus excessive force complaints). *Accord Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) (affirming denial of motion for judgment notwithstanding verdict; evidence at trial was sufficient to impute knowledge of Everett Police Department's unconstitutional policy of breaking down doors without warrant when arresting felons to Chief of Police, even though there was no direct evidence of his knowledge, where many police participated in single incident which indicated widespread and flagrant practice that should have been known to Chief).

The court's findings are also in accord with *Justiniano*, 986 F.3d 11, the First Circuit's most recent application of the "exceptionally stringent" requirements for supervisory liability in the excessive force context. Mr. Justiniano, diagnosed with paranoid schizophrenia and experiencing a mental health crisis, was pepper-sprayed and fatally shot by a state trooper during an encounter on the side of the road. *Id.* at 15. Plaintiff alleged that the Superintendent of the Massachusetts State Police should be liable for failing to train his troopers in dealing with mentally ill people. *Id*. at 17. In affirming the dismissal of the § 1983 claim against the superintendent under Rule 12(b)(6), *id*. at 24, the First Circuit noted many deficiencies in the complaint, *see id*. at 22-23, such as plaintiff's failure to allege a specific grave risk of harm; to allege that there were easily available measures that the superintendent could have taken but did not; or to allege that he was

on notice that his troopers might violate the rights of mentally ill people. The complaint did not allege that the Massachusetts State Police generally or the trooper who killed Mr. Justiniano specifically had a history of using excessive force against mentally ill people; the court noted that the superintendent "could not have ignored – with deliberate indifference or otherwise – a non-existent history…." *Id*. at 22. In contrast, the facts as alleged in the complaint here go far beyond the discrete actions of a single trooper in a single incident, but rather point to the widespread acceptance of the use of excessive force against detainees, supported by the policies, customs, and practices of the institution and the actions of numerous employees. And, here, the alleged history of excessive force against detainees is not "non-existent."

b. Qualified immunity.

In their memorandum, Hodgson and Souza identify the steps of the qualified immunity inquiry and then assert that "there is not even the slightest allegation that either the Sheriff or the Superintendent had any involvement with the ordering of the cell search or directing the officers involved in the cell. Thus, the Sheriff and Superintendent are both entitled to Qualified Immunity." (#9 at 7.) As defendants have failed to adequately develop an argument, the court will not belabor the issues. Fernandes had a clearly established constitutional due process right to be free from objectively unreasonable force, and a reasonable defendant would have understood that Sena's conduct violated that right. *See generally Kingsley*, 576 U.S. at 397 (under Fourteenth Amendment, pretrial detainee need only show that force was objectively unreasonable). *Compare Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 67-68, 72-73 (1st Cir. 2016) (reversing grant of summary judgment; whether Fourth Amendment or Fourteenth Amendment applied, reasonable defendant would have known that using force resulting in disproportionately severe injuries and death violated plaintiff's constitutional rights; during time police officers were alleged to have

24

used excessive force, plaintiff was resisting being transported and incarcerated, but was handcuffed and did not pose great physical threat); *Jennings v. Jones*, 499 F.3d 2, 18 (1st Cir. 2007) (under Fourth Amendment standard; existing law clearly established that increase in force resulting in broken ankle after plaintiff had already been restrained by police officers, ceased resisting, and told officers that they were hurting a previously injured ankle violated his constitutional rights).

It was also clearly established that Hodgson and Souza could be liable for a correctional officer's violation of a pretrial detainee's constitutional due process right to be free from objectively unreasonable force. In the excessive force context, it has long been recognized that a supervisor can be held liable if he acts with deliberate indifference and causes a civil rights violation by a subordinate, including through the failure to train or supervise. *See Diaz v. Martinez*, 112 F.3d 1, 4 (1st Cir. 1997); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581-583 (1st Cir. 1994). *See also Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998).

At this early stage of the proceeding, Hodgson and Souza appear to have had "fair warning." Certainly, they may raise qualified immunity when the facts are more fully developed. The court, however, is unpersuaded by their anemic argument on this undeveloped record. As such, the court will not recommend dismissal of Count IV against Hodgson and Souza in their individual capacities on qualified immunity grounds.

B. <u>Count V should be dismissed as to BCSO, Hodgson, and Souza.</u>

Count V alleges that BCSO, Hodgson, and Souza violated Fernandes' rights under the

Massachusetts Civil Rights Act (MCRA) by failing to properly train, supervise, or discipline

correctional staff in matters of excessive force. (#1 ¶164.) [18] The MCRA permits civil action

> [w]henever any person or persons, whether or not acting under color of law,
> interfere by threats, intimidation or coercion, or attempt to interfere by threats,
> intimidation or coercion, with the exercise or enjoyment by any other person or
> persons of rights secured by the constitution or laws of the United States, or of
> rights secured by the constitution or laws of the commonwealth….

Mass. Gen. Laws. ch. 12, § 11H (by state Attorney General). *See* Mass. Gen. Laws. ch. 12, § 11I

(by private parties for interference or attempted interference "as described in section 11H").

To start, Count V against BCSO and against Hodgson and Souza in their official capacities

must be dismissed because the Commonwealth, its agencies, and its employees in their official

capacities are not "persons" within the meaning of the MCRA. *See Canales v. Gatzunis*, 979 F.

Supp. 2d 164, 175 & n. 52 (D. Mass. 2013) (*citing*, *inter alia*, *Williams v. O'Brien*, 78 Mass. App.

Ct. 169, 173 (2010)); *Boulais*, 2002 WL 225936, at *2 (*citing Commonwealth v. ELM Med. Labs*.,

33 Mass. App. Ct. 71, 76-77 (1992)).

 Count V against BCSO, Hodgson, and Souza must be dismissed for another reason. Under

the MCRA, "threats, intimidation or coercion" is "the 'essential element.'" *Chaabouni* v. *City of*

*Boston*, 133 F. Supp. 2d 93, 100 (D. Mass. 2001) (*quoting Layne v. Superintendent of Mass.*

*Correctional Inst.*, 406 Mass. 156, 158 (1989)). The Massachusetts Legislature intended that even

a "direct" violation of a constitutional right "would not be actionable under the [MCRA] unless it

---

[18] Like the parties (##9 at 8, 11 at 18), the court construes Count V as a claim under the MCRA
even though, as pled, it is a claim "under Article I of the Declaration of Rights of the Massachusetts
Constitution." (#1 ¶164.) *See Sepulveda v. UMass Correctional Health, Care*, 160 F. Supp. 3d
371, 390 (D. Mass. 2016).

were accomplished by means of one of these three constraining elements." *Nolan v. CN8*, 656 F.3d 71, 77 (1st Cir. 2011) (citation omitted). *See Swanset Development Corp. v. City of Taunton*, 423 Mass. 390, 396 (1996); *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989). In this context, "threats" means intentional exertion of pressure to make another fearful or apprehensive of injury or harm; "intimidation" means putting in fear for the purpose of compelling or deterring conduct; "coercion" means application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done. *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994) (citation omitted).

Fernandes argues that the facts in the complaint plausibly allege a claim against BCSO, Hodgson, and Souza under the MCRA because, as alleged, he was beaten by a correctional officer under the management and supervision of defendants, who fostered and tacitly condoned the use of excessive force. Moreover, Sena threatened him after the beating and other correctional workers and case workers threatened him after he filed a grievance form. (#11 at 19.)

The court assumes, without deciding, that the facts plausibly allege a claim against Sena and other correctional officers and case workers under the MCRA. They do not, however, plausibly allege a claim against BCSO, Hodgson, or Souza. It is well settled that MCRA claims may not be based on an alleged failure to train or supervise because the failure to train or supervise does not involve "threats, intimidation or coercion." *See Raymond v. City of Worcester*, 142 F. Supp. 2d 145, 149 (D. Mass. 2001) ("Courts within the First Circuit have consistently held…that a municipality's failure to train, regulate, discipline or supervise its police officers is not actionable under [the MCRA] because such failure does not involve 'threats, intimidation or coercion' by the municipality") (*citing Sheehy v. Town of Plymouth*, 948 F. Supp. 119, 127 (D. Mass. 1996); *Armstrong v. Lamy*, 938 F. Supp. 1018, 1042 (D. Mass. 1996); *Gross v. Bohn*, 782 F. Supp. 173,

185 (D. Mass. 1991); *Curran v. City of Boston*, 777 F. Supp. 116, 122 (D. Mass. 1991); *Hathaway v. Stone*, 687 F. Supp. 708, 711 (D. Mass. 1988)). *See also Baron v. Hickey*, 242 F. Supp. 2d 66, 77 (D. Mass. 2003) (*citing Raymond*, 142 F. Supp. 2d at 149); *Andujar v. City of Boston*, 760 F. Supp. 238, 243 (D. Mass. 1991) (*citing Hathawa*y, 687 F. Supp. at 711).[19]

Fernandes, relying on the Massachusetts Appeals Court's decision in *Sarvis v. Boston Safe Deposit and Trust Co*., 47 Mass. App. Ct. 86 (1999), argues that BCSO, Hodgson, and Souza may be vicariously liable for "threats, intimidation or coercion" by Sena and other correctional officers and case workers. (#11 at 20.) *Sarvis*, however, involved a private employer. 47 Mass. App. Ct. at 97 ("Our decisions have impliedly recognized that a plaintiff may state a cause of action under the MCRA against a private employer based on respondeat superior…"). The MCRA does not permit holding public employers, as opposed to private employers, vicariously liable. *Chaabouni*, 133 F. Supp. 2d at 101-103 (municipalities). *See Horan v. Cabral*, 277 F. Supp. 3d 229, 235 (D. Mass. 2017) ("the MCRA has traditionally precluded liability under theories of respondent superior in the public sphere") (*citing*, *inter alia*, *Chaabouni*, 133 F. Supp. 2d at 101-103).

For these reasons, the court recommends dismissal of Count V, the MCRA claim, as to BCSO, Hodgson, and Souza.

---

[19] At oral argument, Fernandes' counsel sought to distinguish particular cases in this long line because they purportedly involved "isolated" threats, intimidation, or coercion, not "pervasive" threats, intimidation or coercion. (#23 at 7.) That distinction does not hold. The harassment in *Baron*, which allegedly stemmed from plaintiff's breaking a "code of silence" by reporting a fellow correctional officer's misconduct, can only be described as pervasive. 242 F. Supp. 2d at 70-71. Still, the court, following *Raymond*, dismissed the MCRA claim based on an alleged failure to train correctional staff. *Id*. at 77.

C.  Count VI, the assault and battery claim, should be dismissed as to BCSO.

Fernandes concedes that Count VI, the assault and battery claim, should be dismissed as to BCSO. (#11 at 20.) The claim fails because BCSO, as a state agency, is protected by sovereign immunity. *See Boulais*, 2002 WL 225936, at *1 (Massachusetts Tort Claims Act (MTCA) does not waive sovereign immunity in federal court) (citing *Irwin v. Commissioner of Dep't of Youth Servs.*, 388 Mass. 810, 819 (1983)).[20]

V.  Conclusion.

For the reasons set out above, it is recommended that defendants' motion to dismiss (#8) be ALLOWED with regard to the assault and battery claim against BCSO (Count VI); ALLOWED with regard to the state constitutional claim as to BCSO, Hodgson, and Souza (Count V); ALLOWED with regard to the § 1983 claim against BCSO and against Hodgson and Souza in their official capacities (Count IV); but, DENIED with regard to the § 1983 claim against Hodgson and Souza in their individual capacities (Count IV).

VI.  Review by District Judge.

The parties are advised that any party who objects to this recommendation must file a specific written objection with the Clerk of this Court within fourteen days of service of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review. *See*

---

[20] Even if it did waive sovereign immunity in federal court, the MTCA exempts from waiver intentional torts, "including assault, battery…." Mass. Gen. Laws ch. 258, § 10(c).

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *U.S. v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *U.S. v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Manor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

August 2, 2021                                        /s/ M. PAGE KELLEY
                                                     M. Page Kelley
                                                     Chief United States Magistrate Judge